# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 16, 2015    Decided July 21, 2015

No. 14-7002

BELIZE SOCIAL DEVELOPMENT LIMITED,
APPELLEE

v.

GOVERNMENT OF BELIZE,
APPELLANT

———

Consolidated with 14-7003, 14-7018

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:09-cv-02170)

———

*Creighton R. Magid* argued the cause and filed the briefs for appellant. *Marcus W. Sisk Jr.* entered an appearance.

*Louis B. Kimmelman* argued the cause for appellee. With him on the brief were *Dana C. MacGrath* and *Ryan C. Morris*.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Belize Social Development Limited ("BSDL") petitioned the district court to confirm an arbitration award rendered against the government of Belize. The arbitration award arises out of the alleged breach by Belize of a 2005 agreement between Belize and Belize Telemedia Limited, BSDL's predecessor in interest. Belize had declined to participate in the arbitration underlying the petition and took the position in the district court and before us that the Prime Minister at the time of the entry of the agreement lacked authority to enter either the underlying contract or the arbitration agreement and that therefore, the arbitration exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, does not apply, so that Belize remains immune from this action and the courts of the United States do not have jurisdiction over this litigation. Because Belize had not provided support for its claim with respect to the arbitration agreement, the district court rejected the contention and entered judgment in favor of BSDL. *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 33–34 (D.D.C. 2013). For the same reason, we affirm the judgment of the district court.

## BACKGROUND

In 2005, Belize, acting under the direction of then-Prime Minister Said Musa, entered into an agreement styled "The Accommodation Agreement" with Belize Telemedia Limited, Belize's largest private telecommunications company. Under

the agreement, the company contracted to purchase properties from Belize which the country desired to sell "in order to better accommodate the Government's communication needs." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 728 (D.C. Cir. 2012). As part of the transaction, Telemedia was to obtain relief from tax and regulatory burdens otherwise applicable to the company, and receive other significant benefits. The agreement, among other things, (1) guaranteed Telemedia a 15% rate of return on investments, with any shortfall to be paid by Belize; (2) gave Telemedia preferential tax treatment; (3) excluded Telemedia from import duties; and (4) committed Belize to ensuring that "no person other than BTL and [Speednet Communications Limited, BTL's competitor,] have or will have or be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunication services involving or allowing the provision or transport of voice services." Government Telecommunications Accommodation Agreement §§ 3.1, 6.1, 11.4, 11.3, September 19, 2005, Joint Appendix 129–160. The parties also agreed to an arbitration clause which stated:

> Any dispute arising out of or in connection with this Agreement including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this Section.

*Id.* at § 15.2.

The administration of Prime Minister Musa lasted only until 2008, when Prime Minister Dean Barrow took office.

The new prime minister renounced the Accommodation Agreement, asserting that it was repugnant to the laws of Belize and therefore invalid. Belize then ceased to honor the contractual obligations as asserted by Telemedia. Telemedia repaired to the terms of the arbitration clause and submitted the dispute to arbitration before the LCIA in London. Belize refused to participate in the arbitration proceedings, contending, as it contends now, that the arbitration clause was invalid and that the arbitrators lacked jurisdiction. On March 18, 2009, the arbitral tribunal ruled that the Accommodation Agreement was valid and binding on Belize; that the tribunal had jurisdiction over Telemedia's claims; and that Belize had breached the accommodation agreement. *Belize Soc. Dev. Ltd.*, 668 F.3d at 728. The arbitral tribunal granted Telemedia declaratory relief, and awarded over 38 million Belize dollars in damages. *Id.* Two days later, Telemedia assigned the monetary portion of its award to BSDL. *Id.*

In November 2009, BSDL brought suit in the District Court for the District of Columbia to confirm the arbitral award pursuant to section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207. Belize moved to stay confirmation of the award pending resolution of related litigation in Belize. The district court obliged; BSDL appealed. We reversed, noting that under the FAA, the stay order "was not in conformity with federal law and international commitments." *Belize Soc. Dev. Ltd.*, 668 F.3d at 733. We remanded and instructed the district court "to review and grant BSDL's petition to confirm the Final Award absent a finding that an enumerated exception to enforcement . . . applie[s]." *Id.* On remand, Belize argued that the district court lacked subject matter jurisdiction over the dispute because it was entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"). *Belize Soc. Dev. Ltd.*, 5 F. Supp. 3d at 32. The district court held that jurisdiction was proper under the

arbitration exception to the FSIA, and granted BSDL's petition to confirm the award. *Id.* at 33. This appeal followed.

## ANALYSIS

The Foreign Sovereign Immunities Act is "the sole basis for obtaining jurisdiction over a foreign state in the courts of [the United States]." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Its terms are absolute: Unless an enumerated exception applies, courts of this country lack jurisdiction over claims against a foreign nation. *Saudi Arabia v. Nelson*, 507 US. 349, 355 (1993). BSDL claims the arbitration exception applies to this case.

The arbitration exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).

Where a plaintiff has asserted jurisdiction under the FSIA and the defendant foreign state has asserted "the jurisdictional defense of immunity," the defendant state "bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Belize makes two arguments as to why the arbitration exception does not apply.

First, Belize argues that the arbitration exception to sovereign immunity does not apply because there was no "agreement made by the foreign state." 28 U.S.C. § 1605(a)(6). Belize syllogizes as follows: The Prime Minister lacks actual authority to bind the sovereign in an unconstitutional agreement; the Accommodation Agreement violates the Constitution and laws of Belize; therefore, the Prime Minister lacked authority to bind Belize in the Accommodation Agreement. Pet. Br. 9–10. Belize concludes that because the Prime Minister lacked actual authority to execute the Accommodation Agreement on behalf of Belize, the agreement is void *ab initio*, and there is no "agreement made by the foreign state." *Id.* at 19, 22.

Essential to Belize's analysis is the assumption that if the former Prime Minister lacked actual authority to execute the Accommodation Agreement, then every provision in the agreement, including the arbitration provision, is void. Because this assumption is incorrect, Belize's argument fails.

The language of the FSIA arbitration exception makes clear that the agreement to arbitrate is severable from the underlying contract. The exception only requires a valid "agreement . . . to submit to arbitration," 28 U.S.C. § 1605(a)(6). It also distinguishes between the underlying "legal relationship" and the agreement to arbitrate disputes

arising from that relationship. *Id.* As we have previously noted, the agreement to arbitrate is "separate from the obligations the parties owe to each other under the remainder of the contract." *Marra v. Papandreou*, 216 F.3d 1119, 1123, 1125 (D.C. Cir. 2000). It is, for all intents and purposes, "a distinct contract in and of itself." *Id.*; *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) (distinguishing between the agreement to arbitrate and the underlying contract). In order to succeed in its claim that there was no "agreement made by the foreign state . . . to submit to arbitration," 28 U.S.C. § 1605(a)(6), Belize must show that the Prime Minister lacked authority to enter into the arbitration agreement. This Belize has failed to do.

In the district court, Belize argued that the Prime Minister lacked authority to enter into the Accommodation Agreement. *See, e.g.*, Respondent's Preliminary Response to Petition to Confirm Arbitration Award at 30, *Belize Soc. Dev. Ltd. v. Gov't of Belize*, No. 1:09-cv-02170 (D.D.C. Aug. 8, 2014) ("[T]he Accommodation Agreements are null and void, ab initio, because the Prime Minister had no authority to enter into an agreement that would exempt [Telemedia] from its tax liabilities under Belize law."). Belize repeated the same argument in this Court. *See, e.g.*, Pet. Br. 9 ("The Accommodation Agreements are void *ab initio* because the former Prime Minister lacked actual authority to execute them."). But Belize presents nothing beyond its bare allegation in support of its argument that the Prime Minister lacked authority to enter the *agreement to arbitrate*. Without such support, Belize failed to carry its burden of establishing that BSDL's allegations do not bring this case within the FSIA's arbitration exception.

More briefly put, this case turns on the proposition that Belize entered two agreements: the Accommodation

Agreement and the Agreement to Submit to Arbitration, albeit the two were entered simultaneously. The argument of Belize that the Accommodation Agreement was beyond the authority of the Prime Minister might provide a defense if we were considering this controversy *de novo* on its merits. However, in order to bring that argument before us, Belize must first establish that the arbitration provision of the contract is void, so that we would not be bound to honor the arbitral tribunal's determinations. We cannot determine the merits of the defense if the arbitration clause applies. Since Belize has not negated the clause, we do not reach the merits defense.

This brings us to Belize's second line of defense. Belize argues that the arbitration exception does not apply because the award is not "governed by a treaty or other international agreement . . . calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). Specifically, Belize contends that the relevant treaty, the New York Convention, does not govern the award because the award does not arise from a commercial transaction, as required by the treaty, but from a governmental transaction.

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (also known as the New York Convention) is a multilateral treaty providing for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), art. I(1), 21 U.S.T. 2517 (1970). For most signatories, the New York Convention applies to all private arbitral agreements, regardless of the subject matter. Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987). The United States, however, made a declaration, authorized by Article I(3) of the Convention, that the

Convention would be applicable "only to differences arising out of legal relationships whether contractual or not, which are considered commercial under the national law of the State making such declaration." New York Convention, 21 U.S.T. 2517. The United States implemented the Convention in the Federal Arbitration Act, 9 U.S.C. § 201 et seq. *See id.* at § 202 (applying the Convention to an award that arises "out of a legal relationship, whether contractual or not, which is considered as commercial").

The New York Convention, as codified in the FAA, does not define the term "commercial." "When a statute uses [a term of art], Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). In the context of international arbitration, "commercial" refers to "matters or relationships, whether contractual or not, that arise out of or in connection with commerce." Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1 (2012); *see* Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987) ("That a government is a party to a transaction does not destroy its commercial character; indeed, the fact that an agreement to arbitrate is in the contract between a government and a private person may confirm its commercial character . . . ."). As the Comment to the Restatement on International Commercial Arbitration explains, "A matter or relationship may be commercial even though it does not arise out of or relate to a contract, so long as it has a connection with commerce, whether or not that commerce has a nexus with the United States." Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1 cmt. e; *see Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y. 1973) ("[I]t seems clear that the full scope of 'commerce' and 'foreign commerce,' as those terms have been broadly interpreted, is available for arbitral agreements and awards." (quoting Leonard V. Quigley,

*Convention on Foreign Arbitral Awards*, 58 A.B.A. J. 821, 823 (1972))). Using the Restatement's definition of "commercial," the New York Convention applies to the Accommodation Agreement.

The text of the FAA's codification of the New York Convention is consistent with this conclusion. While the New York Convention, as codified in the FAA, does not expressly define "commercial," it does expressly encompass any "transaction, contract, or agreement described in" 9 U.S.C. § 2. 9 U.S.C. § 202. Section 2 in turn includes contracts "evidencing a transaction involving commerce," 9 U.S.C. § 2 – a term the Supreme Court has interpreted "as the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power," *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). The Accommodation Agreement falls within that term's broad compass.

The Agreement involves the sale of real property in exchange for certain accommodations, a transaction with a connection to commerce. *See Holzer v. Mondadori*, No. 12 Civ. 5234, 2013 WL 1104269, at *5 (S.D.N.Y. Mar. 14, 2013) (noting that the sale of property is commercial under the New York Convention). The provision of telecommunication services has an even more obvious connection to commerce. Indeed, in today's technological age, telecommunication services are often a "crucial segment of the economy." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999). The taxes Belize levies against a company also have a connection with commerce, *see Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 614–15 (1981) (noting the impact taxes have on commerce), as do the duties Belize charges (or forgoes charging). We thus conclude that the

Accommodation Agreement is commercial and is governed by the New York Convention.

Belize seeks to avoid this result by arguing we should adopt the definition of "commercial" articulated by the Supreme Court in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992). In that case, the Supreme Court, in examining the scope of the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), held that a foreign state engages in commercial activities when it acts in the manner of a private player within the market. *Weltover*, 504 U.S. at 614. The Court reasoned that the FSIA "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity"; that the word "commercial" was a "term of art"; and that Congress therefore intended the word to have "the meaning generally attached to that term under the restrictive theory at the time the statute was enacted," *i.e.*, distinguishing between "state sovereign acts, on the one hand, and state commercial and private acts, on the other." *Id.* at 612–13. In this case, Belize argues that in granting Telemedia certain tax and duty exemptions, it exercised "powers peculiar to sovereigns" as opposed to "powers that can also be exercised by private citizens," *id.* at 614, and thus its actions were not commercial.

Belize's reliance on *Weltover* is misplaced. Unlike with the FSIA, Congress was not codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention. Rather, the treaty concerns international arbitration. We thus recognize that: (1) the Convention's purpose was to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts," *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007); (2) the word "commercial" is a "term of art"; and (3) in implementing the Convention, Congress intended that word to have the meaning

generally attached to that term in the international commercial arbitration context. As we discussed above, "commercial" in the context of international arbitration refers to matters which have a connection to commerce. Belize's argument to the contrary will not sell.

Belize raises several other arguments for why we should dismiss this action, including *forum non conveniens*, international comity, and lack of personal jurisdiction, as well as specific defenses under the Convention. These arguments were adequately discussed and rejected by the district court, and none warrant further exposition by this Court.

## CONCLUSION

For the reasons stated above, the judgment below is affirmed.

*It is so ordered.*