# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 15, 2015 Decided May 31, 2016

No. 14-7142

DIAG HUMAN, S.E.,
APPELLANT

v.

CZECH REPUBLIC — MINISTRY OF HEALTH
APPELLEE

On Appeal from the United States District Court for the
District of Columbia
(No. 1:13-cv-00355)

*Hyman L. Schaffer* argued the cause for petitioner and filed the briefs for appellant.

*Alana E. Fortna*, argued the cause for respondents. With her on the brief was *Leonard Fornella*. *Dean A. Calland* entered an appearance.

Before: TATEL[*] AND BROWN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

---

[*] Judge Tatel was drawn to replace Chief Judge Garland, who originally heard argument in this case but did not participate in the opinion. Judge Tatel has read the briefs, reviewed the record, and listened to the recording of the oral argument.

Opinion filed for the Court by *Circuit Judge* BROWN. Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

BROWN, *Circuit Judge*: A medical technologies company, embroiled in a dispute with the Czech Republic Ministry of Health, appeals the district court's decision to dismiss, *sua sponte*, its claim for enforcement of a foreign arbitral award for lack of subject matter jurisdiction. We reverse.

**I**

Soviet rule, as the playwright and dissident Václav Havel said, left "a legacy of countless dead, an infinite spectrum of human suffering, profound economic decline, and above all enormous human humiliation." President Václav Havel, Address Before a Joint Session of the U.S. Congress (Feb. 21, 1990). Eastern Europe's transition from Communist rule to democracy has not been easy. Centralized political systems were slow to respond to new or emerging needs, including in health care. For example, after the fall of its communist government, Czechoslovakia[1] faced a state-run health care system on the verge of collapse, stagnated health status indicators, and critical shortages of blood plasma. *See* Eur. Observatory on Health Care Systems, Health Care Systems in Transition: Czech Republic (2000), *available at* http://www.euro.who.int/__data/assets/pdf_file/0019/75151/E70931.pdf.

The government had little in the way of hard currency reserves, next to no access to credit, and numerous demands

---

[1] Czechoslovakia existed as a sovereign state from October 1918 until its peaceful dissolution into the sovereign states of the Czech Republic and Slovakia on January 1, 1993.

on its limited resources.  *See*, *e.g.*, Anders Åslund, BUILDING CAPITALISM: THE TRANSFORMATION OF THE FORMER SOVIET BLOC (2002).  The government was in no position to fund the nationwide infrastructure required to provide the country with adequate supplies of blood plasma.  The Czech Ministry of Health needed to provide for blood plasma requirements without expending large amounts of money up front.  Diag Human offered a creative solution.[2]

Thus in 1990, the Ministry of Health entered into an agreement with Diag Human, a blood plasma technologies and production company. Under the "Framework Agreement" crafted by the parties, the Ministry contracted to purchase the necessary technical equipment and to provide training for medical personnel to ensure fractionated blood products would be safely transported and made available to transfusion wards throughout the Czech Republic.  In lieu of monetary compensation for its performance under the Framework Agreement, Diag Human agreed to accept a share of the total volume of fractionated plasma produced.  This alternative funding arrangement made it possible for the Ministry to provide the necessary infrastructure despite the country's depleted coffers.

By all accounts, Diag Human performed competently under the Framework Agreement.  The company quickly established cooperation agreements with twenty state-owned hospitals and outfitted fourteen transfusion stations with equipment for plasma collection.  The plasma was delivered to Novo Nordisk, a company that fractionated the plasma

---

[2] The precise corporate names and identities varied throughout the facts of this case, but these distinctions are not material to the present dispute.  For simplicity's sake, we will refer to Diag Human and its related entities as "Diag Human" throughout.

outside the Czech Republic, and imported it back into the country. As agreed, Diag Human offset the cost of these modernization efforts and sustained a profitable business model by retaining a portion of the fractionated plasma.

Nevertheless, when the arrangement was only a few months old, the Ministry opened a bid tender seeking cooperation for the production of fractionated blood plasma—essentially looking to replace the Framework Agreement. Diag Human and two other companies submitted bids. But shortly after receiving those bids, the Ministry suspended the tender entirely—allegedly based on information received from the Czech Federal Police accusing Diag Human of illegally exporting drugs from the country. Although Diag Human won the bidding process and was ultimately cleared of any wrongdoing by the criminal investigation, the Ministry did not award the new tender to Diag Human. In the meantime, Diag Human continued to perform under the existing Framework Agreement.

In 1991, the Ministry opened a second tender to supersede the first tender, again seeking cooperation for the production of fractionated blood plasma. Diag Human again submitted a bid. But the Ministry rejected the company's bid because it relied on a third party (Novo Nordisk) for fractionation.

While the second tender was pending, Diag Human alleges the Ministry sent a letter to Novo Nordisk that has become the focal point of this dispute. The letter informed Novo Nordisk that Diag Human had not received the contract because of the Ministry's concerns over the company's business ethics. Diag Human says that this letter caused Novo Nordisk to discontinue its business relationship with Diag Human, Pl.'s Opp. at 7; Def.'s Mem. at 29, which led

directly to the collapse of Diag Human's business in the Czech Republic. Compl. ¶ 9; Pl.'s Opp. at 8; Def.'s Mem. at 2. According to Diag Human, "[t]he clear intention of the letter was to cripple Diag Human's ability to perform its obligations with the Czech Republic by having Novo Nordisk cease doing business with Diag Human." Diag Br. at 17. As a result, Diag Human could no longer perform under the Framework Agreement, which freed the Ministry to pursue other options for obtaining fractionated blood.

In 1996, Diag Human sued the Ministry in the Prague Commercial Court over the events outlined above, and the parties agreed to resolve their dispute in arbitration. The arbitration ended in 2008, with the tribunal concluding that the Czech Republic and the Ministry had breached their duties to Diag Human, resulting in commercial losses. The tribunal awarded damages and interest totaling more than $325 million to Diag Human.

Diag Human then filed suit in the district court for the District of Columbia, seeking to enforce the 2008 arbitration award against the Czech Republic. Diag Human invoked the Federal Arbitration Act, 9 U.S.C. § 201, which, among other things, codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

The district court, however, dismissed the case *sua sponte* for lack of subject matter jurisdiction. The district court concluded that the relationship between Diag Human and the Ministry was not "commercial" in nature, and therefore the New York Convention did not apply. Additionally, the district court concluded the Czech Republic had not waived its sovereign immunity under the

terms of the Foreign Sovereign Immunity Act, 28 U.S.C. § 1605(a)(1).

## II

We review a district court's dismissal of a case for lack of subject matter jurisdiction *de novo*. *Fisher-Cal Industries, Inc. v. United States*, 747 F.3d 899, 902 (D.C. Cir. 2014). Where jurisdiction is sought over a foreign sovereign for the enforcement of an arbitral award, we have held two conditions must be satisfied: "First, there must be a basis upon which a court in the United States may enforce a foreign arbitral award; and second, [the foreign sovereign] must not enjoy sovereign immunity from such an enforcement action." *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). Here, we find these two conditions satisfied. For reasons that will be apparent, we will proceed in reverse order.

*Absence of sovereign immunity*. The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Co.*, 488 U.S. 428, 443 (1988). It "bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and … confers jurisdiction on district courts to hear suits … when a foreign state is *not* entitled to immunity." *Id*. at 434 (emphasis in original). As relevant here, the FSIA's arbitration exception to sovereign immunity provides that

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which the action is brought … to enforce an agreement made by the foreign state with or for

the benefit of a private party to submit to arbitration any or all differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, … if … the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).

Two aspects of that standard are in dispute here: (1) whether Diag Human shared with the Czech Republic "a defined legal relationship, whether contractual or not" and (2) whether the arbitration award "is or may be governed by a treaty or other international agreement in force for the United States." *Id*. We answer both of these questions in favor of Diag Human and conclude that the arbitration exception of the FSIA is satisfied here.

First, the 1990 Framework Agreement defined a legal relationship with the Czech Republic beginning in 1990 with the Framework Agreement. The agreement set out the purposes of the cooperative arrangement between Diag Human and the Czech Republic as "ensur[ing] fractionation products from frozen human plasma for the needs of Czechoslovak health care system" and "equip[ping] cooperating transfusion wards with necessary technical equipment to increase plasma production possibilities." JA at A765. It listed both of the parties to the arrangement and the "[l]egal conditions of the cooperation," which included two Czech statutes. *Id*. The agreement also detailed the obligations of each side. For the Czech Republic, this included organizing and examining donors and freezing and storing plasma. For Diag Human, it included supplying

necessary equipment; collecting, storing, and transporting plasma; training staff at Czech transfusion wards; and ensuring plasma fractionation in foreign countries. *Id.* at A766. And the agreement made clear that "[t]he technological equipment supplied to transfusion wards will be paid for with a share, determined in advance, of the total volume of plasma prepared for fractionation until the equipment is repaid." *Id.*

For purposes of the FSIA's arbitration exception, we need not determine if the Framework Agreement constituted a contract. We need only determine that the Framework Agreement created "a defined legal relationship, whether contractual or not," 28 U.S.C. § 1605(a)(6), and we conclude it did. The agreement explicitly contemplated which parties it would obligate, the extent of the obligations, the remuneration exchanged for meeting the obligations, and the legal framework to govern the arrangement. In this way, the agreement defined a relationship between the parties, and given the subject matter of reciprocal obligations and responsibilities, we have no trouble concluding the relationship was legal in nature. Whether the agreement was lacking in other typical contract forms is of no relevance here; the FSIA explicitly contemplates that some legal relationships will qualify under § 1605(a)(6) despite not rising to the formality of a contractual arrangement. The relatively informal arrangement of the Framework Agreement, then, is enough to establish a "legal relationship" of the kind necessary for the FSIA's arbitration exception to apply.

The Czech Republic contends any legal relationship it shared with Diag Human had ended by the time this dispute arose and that its "interest in developing cooperation . . . to ensure [the availability of] fractionation products . . . never came to fruition." Response Br. at 21. Yet this contention

rings hollow since by all accounts Diag Human *did* supply the necessary training, technology, and coordination required for modernizing the Czech Republic's plasma system. That kind of performance is hardly consistent with a fruitless arrangement. And Diag Human also "possessed all of the necessary administrative permits of the [Czech Republic] to buy plasma" and "was treated as a priority on the Czech market," which further indicates that the Czech government knew of and supported Diag Human's efforts to meet its obligations under the Framework Agreement. JA at A112. Moreover, since the agreement was open-ended, we cannot conclude that it ended at any time prior to the 1992 letter that is the subject of this dispute. Thus, we conclude that Diag Human and the Czech Republic shared a legal relationship at the time of the events giving rise to this case.

Second, Diag Human has amply demonstrated that its arbitration award "may be governed by a treaty or other international agreement," namely, the New York Convention. 28 U.S.C. § 1605(a)(6). The New York Convention is a multilateral treaty providing for "the recognition and enforcement of arbitral awards" across international borders. Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), Art. I(1), 21 U.S.T. 2517 (1970). Both the Czech Republic and the United States are signatories. In the United States, Congress has codified the Convention in the Federal Arbitration Act, 9 U.S.C. §§ 202 *et seq*., which provides that any "action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States" and that the "district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." *Id*. § 203. In the United States, an arbitral award falls under the Convention when it "aris[es] out of a

legal relationship, whether contractual or not, which is considered as commercial." *Id.* § 201. The "commercial" aspect of this standard is optional—chosen (or not) by each individual signatory. The United States has adopted this commercial restriction.

Here, we conclude Diag Human has satisfied its burden of showing that its arbitration award "may be governed" by the New York Convention because, as explained above, Diag Human had a legal relationship with the Czech Republic, and additionally, that relationship was commercial in nature. We have previously noted that the Convention does not define the word "commercial," and so we have given that word its established meaning as a term of art in its field. *Belize Soc. Dev. Ltd. v. Belize*, 794 F.3d 99, 103–04 (D.C. Cir. 2015). In the field of international arbitration, "commercial" refers to "'matters or relationships, whether contractual or not, that arise out of or in connection with commerce.'" *Id.* at 104 (quoting Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1 (2012)). Accordingly, a matter may be commercial even if not contractual, "so long as it has a connection with commerce." *Id.*

Diag Human's legal relationship with the Czech Republic through the Framework Agreement was commercial in nature. The provision of healthcare technology and medical services has an obvious connection to commerce. Deane Waldman, *Is Health Care 'Commerce'?*, THE AMERICAN THINKER (Apr. 15, 2012), http://www.americanthinker.com /articles/2012/04/is_health_care_commerce.html. Indeed, health care, including medical devices and medical care services, accounts for a significant portion of the global economy, totaling nearly $6.5 trillion in expenditures last year alone. *Spending on Health: A Global Overview*, WORLD

HEALTH ORGANIZATION (Apr. 2012) http://www.who.int/mediacentre/factsheet/fs319/en/.

Under the Framework Agreement, Diag Human agreed to supply commercial goods to the Czech Republic in the form of blood plasma technologies and equipment. The fact that the Czech Republic agreed to fund Diag Human's investment in blood plasma technologies through a percentage of blood plasma collected rather than through an up-front payment does not change the commercial nature of the relationship, which turned in large part on the transmission of valuable commodities from one party to the other. While other services were also exchanged under the Agreement, it is enough that some commodities were exchanged as well. "Commercial" merely means "matters which have a connection to commerce," and the Framework Agreement is clearly connected to commerce. Any "argument to the contrary will not sell." *Belize Soc. Dev. Ltd.*, 794 F.3d at 105.

Thus, we find for Diag Human on both of the contested FSIA issues here: Diag Human and the Czech Republic shared a legal relationship, and their arbitration "may" be governed by the New York Convention. The Czech Republic is not entitled to sovereign immunity in this matter under the FSIA's arbitration exception. 28 U.S.C. § 1605(a)(6).

*Basis for a U.S. Court to enforce an arbitration award.* To satisfy our standard for subject matter jurisdiction in an international arbitration case against a foreign sovereign, we must assure ourselves not only that the foreign sovereign is not entitled to sovereign immunity, but also that a basis exists upon which "a court in the United States may enforce [the] foreign arbitral award." *Creighton Ltd.*, 181 F.3d at 121. Our FSIA analysis in the previous section answers this question. We have already established that the New York

Convention, as codified by the United States, grants federal courts jurisdiction over arbitration disputes that fall within its ambit. 9 U.S.C. § 203. And we have established that in the United States, an arbitral award falls under the Convention when it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial." *Id*. § 202. Here, Diag Human's relationship with the Czech Republic qualifies as a commercial legal relationship, and the arbitration at issue here arises out of that commercial legal relationship. A legal basis exists for federal courts to enforce this arbitration award, and so we are satisfied that subject matter jurisdiction exists.

The dissent sees this matter differently not because it disagrees with our analysis here, but because it believes that analysis rests on our resolution of disputed facts, facts which the district court resolved and to which resolution we are bound to defer. Dissent Op. at 1. But the dissent confuses disputed *facts* with the disputed *legal consequences* of facts. The district court determined that a legal relationship did not exist between these parties. That conclusion is not a factual one, but a legal conclusion about the importance attributed to certain facts under the law. The relevant facts here are not in dispute—the parties agree about the existence of the Framework Agreement (just not its legal consequences), about the conduct of the two tender bids (just not why those bids took place or how they were awarded), and Diag's performance of certain blood services in the country (just not whether that performance was relevant to establishing a legal relationship). We have resolved only disputed questions of law, and as to those questions, we appropriately review the district court's decision *de novo*.

We wrap-up by addressing an issue that arose at oral argument: whether the arbitration award to be enforced here

is final and how finality might (or might not) affect the resolution of this appeal. Though not covered in the briefing, it seems the arbitration award Diag Human obtained may have been subsequently reversed by an appellate arbitration panel, although the legitimacy of that reversal remains disputed between the parties. This appeal, however, concerns only whether the district court possessed subject matter jurisdiction to hear the dispute over the arbitral award. We have answered that question, and nothing about our holding suggests an outcome on the merits one way or the other. Whether the arbitration award is final will be a question going to the merits of the case, as it could determine whether the arbitration award can be enforced or not. Our opinion today expresses no view on the matter. It is enough for us to establish that the district court possesses subject matter jurisdiction to proceed with this case.

## III

For these reasons, we reverse the holding of the district court and this case is remanded for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: In reversing the district court's dismissal for lack of jurisdiction, the majority discerns error both in the district court's determination that the dispute did not come within the New York Convention and that the Czech Republic had not otherwise waived its sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(1). *See* Maj. Op. at 6. In so concluding, the majority holds that Diag Human and the Czech Republic had a commercial legal relationship at the time this dispute arose, thereby bringing the arbitration award at issue within the scope of the FSIA and the New York Convention. *See* 28 U.S.C. § 1605(a)(6); 9 U.S.C. § 202. I see no error in the district court's finding that any legal relationship between Diag Human and the Czech Republic ended before the present dispute. Nor do I conclude that the Czech Republic has otherwise waived its sovereign immunity. I would therefore affirm the district court.

We stated in *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992), that the procedural posture by which a district court considers subject-matter jurisdiction "has a profound effect on the manner in which this Court will review its disposition." Where the district court relies only on "undisputed facts within or outside the pleadings," our review is necessarily de novo. *Id.* "If, however, the trial court rests not only upon undisputed statements, but determines disputed factual issues, we will review its findings as we would any other district court's factual determinations: accepting them unless they are 'clearly erroneous.'" *Id.* These principles suffice to dispose of this case.

First, the district court did not clearly err when it found that any legal relationship between Diag Human and the Czech Republic ended before the dispute arose. Diag Human's complaint nowhere references a commercial relationship between the Czech Republic and Diag Human. *See* J.A. 388-96. Instead, the complaint avers that the Czech

Republic's "actions had illicitly disrupted cooperation between Diag Human and a second company, Novo Nordisk, . . . causing it eventually to shut down." J.A. 390 ¶ 9. The district court so concluded when it dismissed Diag Human's complaint sua sponte. *See Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 29 (D.D.C. 2014) ("Before entering into the Arbitration Agreement, plaintiff and defendant did not have any legal relationship, let alone a commercial one.").

Only with its Rule 59(e) motion for reconsideration did Diag Human provide *any* evidence, or even an allegation, that it had an ongoing legal relationship with the Czech Republic. *See* J.A. 712-14. Specifically, Diag Human presented the Declaration of Joseph Stava, which supposedly establishes such a relationship "through a cooperation program and Framework Agreement between the Ministry and Diag Human." J.A. 813. The district court considered the statements in the Stava Declaration and, based on those allegations, agreed "that *at one time* there was a commercial relationship between Diag Human and the Ministry." J.A. 814 (emphasis in original). However, the district court also found that "the parties' commercial relationship changed over time" such that "the commercial relationship between the parties ended before the dispute at issue in this case arose in 1992." *Id.*

Because the district court resolved disputed issues of fact when it dismissed Diag Human's complaint for lack of subject-matter jurisdiction, we review those findings for clear error. *Herbert*, 974 F.2d at 197. I see none. The Stava Declaration contains myriad facts suggesting that Diag Human's relationship with the Czech Republic ended prior to the dispute. For example, the declaration states that the Ministry of Health "decided to open a tender for bids for a

relatively small portion of the work that already was covered by the Framework Agreement," suggesting that it did not see itself as bound by that agreement. J.A. 740 ¶ 14. Furthermore, the Ministry of Health allegedly "aided" Diag Human's competitors "to discredit Diag." *Id.* at 741 ¶ 17. The Ministry did not award an initial tender to Diag Human and "took further steps to cut Diag out as a competitor in the market" while transferring control of Czech hospitals to state regional offices. *Id.* at 742 ¶¶ 18-19. The Ministry also "sent a directive ordering all hospitals to deal exclusively with . . . parties" other than Diag Human. *Id.* at 743 ¶ 20. When the Ministry announced a new tender in 1991 for blood plasma services supposedly covered by the agreement with Diag Human, Diag's bid was unsuccessful. *Id.* ¶ 22. If anything, the Stava Declaration suggests that the Czech Republic affirmatively disavowed any legal relationship it had with Diag Human. Diag's alternative argument that its participation in the tender bids sufficed to create a legal relationship is specious. *Cf. United States v. Comm. Am. Barge Line Co.*, 424 F. Supp. 453, 456 (E.D. Mo. 1977) ("[T]he government is under no obligation to accept bids and [] no legal relationship arises from the submission of the bid." (citation omitted)).

The majority replaces the district court's fact-finding with its own view that "by all accounts Diag Human *did* supply the necessary training, technology, and coordination required for modernizing the Czech Republic's plasma system." Maj. Op. at 9 (emphasis in original); *see also id.* ("Moreover, since the agreement was open-ended, we cannot conclude that it ended at any time prior to the 1992 letter that is the subject of this dispute."). Even disregarding the problem of whether unilateral performance can establish a legal relationship, "[f]actfinding is the basic responsibility of district courts, rather than appellate courts . . . ." *Pullman-*

*Standard v. Swint*, 456 U.S. 273, 291 (1982) (citation and internal quotation marks omitted). Taking the facts as the district court found them, the New York Convention does not apply to Diag Human's claims, meaning that the FSIA, 28 U.S.C. § 1605(a)(6), provides no basis for the district court's jurisdiction. Accordingly, I would affirm.

Second, in my view, the district court did not err in holding that the Czech Republic did not otherwise waive its sovereign immunity. As the majority acknowledges, "The Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" Maj. Op. at 6 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Therefore, as the district court held, if the current dispute is not arbitrable under the New York Convention, then the district court and derivatively this court have no jurisdiction unless the dispute comes within one of the other exceptions to foreign sovereign immunity recognized in the statute. The only other exception asserted before us is that created by 28 U.S.C. § 1605(a)(1), which applies to "any case . . . in which the foreign state has waived its immunity either explicitly or by implication . . . ."

I see no error in the district court's conclusion that the Czech Republic had not explicitly or by necessary implication waived its sovereign immunity. Diag Human only argues implied waiver under § 1605(a)(1). *See* Appellant's Br. at 48. "We . . . follow[] the 'virtually unanimous' precedents construing the implied waiver provision narrowly." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (citation omitted). Specifically, "we have held that implicit in § 1605(a)(1) is the requirement that the foreign state have intended to waive its sovereign immunity." *Id.* That is to say, "[a]n implied waiver depends upon the

foreign government's having at some time indicated its amenability to suit." *Id.* (citation omitted). Because the district court and I agree that the New York Convention provides no exception to sovereign immunity for this case, any implied waiver of the immunity must come from elsewhere. The only "elsewhere" suggested by Diag Human is the fact that in the early stages of this litigation, the Republic moved to dismiss under Rule 12(b)(6) and for forum non conveniens without raising sovereign immunity. I do not agree that this is sufficient foundation to constitute an implied waiver.

Courts have found waivers of implied sovereign immunity in three circumstances: "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990).

While the list from *Foremost-McKesson* is not necessarily exhaustive, it serves to illustrate what is not present in the instant case. For the reasons set forth above, the New York Convention does not apply to Diag Human's arbitral award, meaning the arbitration circumstance is not present. Appellant makes no argument that the second circumstance governs. As to the third circumstance, a motion to dismiss is not a responsive pleading. *Cf. Ashraf-Hassan v. Embassy of Fr.*, 40 F. Supp. 3d 94, 101 (D.D.C. 2014) ("[A] motion to dismiss that omits mention of immunity will not provide sufficient proof of such a conscious decision.").

For the reasons stated above, I believe that the New York Convention is inapplicable to this case, and Diag Human

otherwise provides no compelling argument to rebut the presumed immunity of a sovereign.  I therefore agree with the district court's conclusion that "[n]one of the bases to find an implied waiver exist in this case."  *Diag Human*, 64 F. Supp. 3d at 31.

I respectfully dissent.