# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 22, 2024          Decided August 9, 2024

No. 23-7016

ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO. LTD,
APPELLEE

v.

FEDERAL REPUBLIC OF NIGERIA,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-00170)

---

*Keith Bradley* argued the cause for appellant. With him on the briefs was *ScheLeese Goudy*.

*Jovana Crncevic* argued the cause and filed the brief for appellee.

Before: MILLETT, KATSAS, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* KATSAS.

MILLETT, *Circuit Judge*:  In 2001, China and Nigeria signed a bilateral investment treaty to encourage investment between the two countries.  As part of that bargain, each country agreed to treat the other country's investors fairly and to protect their investments.  The treaty also provided that the countries would arbitrate any disputes with foreign investors.

Appellant Zhongshan Fucheng Industrial Investment then invested in Nigeria, participating in a joint venture with Ogun State, a Nigerian state, to develop a free-trade zone.  After years of development and millions of dollars in investments, Ogun State abruptly ended its relationship with Zhongshan, and Nigerian federal authorities ousted the company's executives from the country.  Zhongshan initiated arbitration proceedings.  An arbitrator found that Nigeria had breached its obligations under the bilateral investment treaty and awarded Zhongshan over $55 million in damages.

Zhongshan now seeks to enforce that arbitral award against Nigeria.  The district court held that it had jurisdiction over this case, finding that the Foreign Sovereign Immunities Act's arbitration exception applied because the award is governed by an international arbitration treaty known as the New York Convention.

We affirm.

# I

## A

### 1

Prior to 1952, the United States granted foreign sovereigns "complete immunity" in courts within the United States as "a

matter of grace and comity[.]" *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983).  For centuries, that rule had been "in harmony with the then-existing general concepts of international practice."  *In re Grand Jury Subpoena*, 912 F.3d 623, 626 (D.C. Cir. 2019) (quotation marks omitted).

Over the course of the nineteenth and twentieth centuries, however, the practice of granting foreign sovereigns complete immunity was called into question.  In particular, as foreign governments became more involved in commercial activity, concerns grew over those governments' ability to "manipulate their immunity" to gain unfair advantages in the marketplace over purely private corporations.  *In re Grand Jury Subpoena*, 912 F.3d at 626.  In response, a growing number of countries began to strip foreign sovereigns of immunity for "private"—typically commercial—acts.  *Id.*

In 1952, the State Department's Acting Legal Adviser issued a letter adopting this "restrictive theory of sovereign immunity."  *In re Grand Jury Subpoena*, 912 F.3d at 626 (quotation marks omitted).  Under that theory, the United States recognized the immunity of foreign sovereigns with regard to sovereign or public acts, but not with regard to private acts.  *See Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004); *Verlinden*, 461 U.S. at 487.

Application of the sovereign–private act distinction, however, "proved troublesome."  *Verlinden*, 461 U.S. at 487.  After 1952, "the State Department continued to advise courts on a case-by-case basis whether immunity should be granted[.]"  *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1169 (D.C. Cir. 1994).  If no advice was given, courts had to independently determine whether immunity was appropriate (that is, whether a foreign state's conduct was private or sovereign).  *See id.*

In 1976, Congress passed the Foreign Sovereign Immunities Act ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended in various sections of 28 U.S.C.), to "free the Government from the[se] case-by-case diplomatic pressures" and to clarify the standards governing sovereign immunity, *Verlinden*, 461 U.S. 488. To that end, the FSIA contains a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities" brought in courts within the United States. *Id.*

Today, the FSIA is the "sole basis for obtaining jurisdiction over a foreign state in the courts of [the United States.]" *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). The FSIA's "terms are absolute": Unless a plaintiff shows that a statutorily enumerated exception to sovereign immunity applies, "courts of this country lack jurisdiction over claims against a foreign nation." *Belize Soc. Dev., Ltd. v. Government of Belize*, 794 F.3d 99, 101 (D.C. Cir. 2015).

**2**

This appeal involves the FSIA's arbitration exception. That exception provides in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case * * * in which the action is brought * * * to confirm an award made pursuant to * * * an agreement to arbitrate, if * * * [the] award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards[.]

28 U.S.C. § 1605(a)(6). To establish jurisdiction under the arbitration exception, a party must offer "more than a claim invoking an arbitration award." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021). The party must show (1) "the existence of an arbitration agreement"; (2) "an arbitration award"; and (3) "a treaty governing the award[.]" *Id*.

The relevant treaty governing the arbitration award in this case is the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517 ("New York Convention"). The New York Convention is a multilateral treaty that provides for signatory states' "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought[.]" New York Convention Art. I(1). The United States is a signatory and "appl[ies] the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." New York Convention, 21 U.S.T. at 2560; *see* New York Convention Art. I(3). Congress implemented the New York Convention in Chapter 2 of the Federal Arbitration Act. *See* 9 U.S.C. §§ 201–208.

In most signatory states, the New York Convention applies to all arbitral agreements, regardless of subject matter. *Belize Soc. Dev.*, 794 F.3d at 103. But the Convention also permits states to adopt a "commercial reservation" that limits the Convention to disputes arising from legal relationships that are "considered as commercial[.]" New York Convention Art. I(3).

The United States adopted the commercial reservation. *See* New York Convention, 21 U.S.T. at 2560; 9 U.S.C. § 202. As a result, the Federal Arbitration Act provides both that (1) "[a]n action * * * falling under the Convention shall be deemed to arise under the laws and treaties of the United States[,]" 9 U.S.C. § 203; and (2) the Convention applies only to an arbitral award "arising out of a legal relationship, whether contractual or not, which is considered as commercial," *id.* § 202.

Neither the New York Convention nor the Federal Arbitration Act defines the term "commercial."

**B**

In 2001, China and Nigeria signed a bilateral investment treaty ("Investment Treaty") aimed at promoting commercial investment between the two countries.[1] The Investment Treaty requires each country to protect investors from the other country and to treat those foreign investors fairly and equitably. The Investment Treaty also provides for arbitration of disputes between an investor and a treaty signatory. *See* Investment Treaty Art. 9. It separately provides for arbitration of disputes between China and Nigeria. *See* Investment Treaty Art. 8.

In 2007, Ogun State began contracting with Chinese companies to develop the Ogun Guangdong Free Trade Zone near Lagos, Nigeria's most populous city and an economic hub. A free-trade zone is a geographic area in which countries relax trade restrictions to promote economic activity and investment. Nigerian federal law, for example, exempts businesses in free-

---

[1] We take these facts from the arbitrator's findings, which are not challenged here. *Cf. United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("[A]n arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.").

trade zones from certain taxes and customs duties. *See* Nigeria Export Processing Zones Act 1992 §§ 8, 12, *available at* https://perma.cc/SE8Z-NHCN.

Ogun State entered into a joint venture agreement with a Chinese company and another company to create the Ogun Guangdong Free Trade Zone Company. The Nigeria Export Processing Zones Authority, a Nigerian federal-government entity that oversees free-trade zones in Nigeria, then delegated control and operation of the free-trade zone to the company.

In 2010, the Ogun Guangdong Free Trade Zone Company contracted with Zhongshan's parent company to develop an industrial park in the free-trade zone. The goal was for Zhongshan's parent company to develop the park and build factories in it for zone tenants to use. Zhongshan's parent company then "effectively transferred its rights" to Zhongshan, which conducted its Nigeria operations through its subsidiary, Zhongfu International Investment (NIG) FZE. J.A. 316. Because the distinctions between the Zhongshan-related entities are irrelevant to the legal issues in this case, we refer to them collectively as "Zhongshan."

Zhongshan invested millions of dollars and significant resources to develop the park. Zhongshan built out infrastructure in the industrial park, including roads and utilities. It also opened services such as a hospital, hotel, supermarket, and bank. The free-trade zone later amended its charter and made Zhongshan a part-owner of the zone. By 2016, businesses had moved into the zone and Nigeria had collected approximately 160 million Nigerian Naira in tax

revenue from the free-trade zone, which amounts to hundreds of thousands of U.S. dollars.[2]

In the first half of 2016, however, Ogun State terminated its agreements with Zhongshan. Ogun claimed that a different Chinese company was legally entitled to Zhongshan's share of the free-trade zone and that Zhongshan had defrauded Ogun.

Things continued to deteriorate. One Ogun official texted a Zhongshan executive urging him "as a friend" to "leave peacefully when there is opportunity to do so, and avoid forceful removal, complications[,] and possible prosecution[.]" J.A. 34. The next month, Ogun issued an arrest warrant for two executives, alleging "criminal breach of trust[.]" J.A. 35. Nigerian federal police arrested one Zhongshan executive at gunpoint and held him for ten days. During that time, the police denied the executive food and water, beat him, intimidated him, and questioned him about the whereabouts of the other executive.

## C

Following Ogun's sudden termination of the relationship, Zhongshan filed lawsuits in Nigerian federal and state courts seeking reinstatement of its contractual rights. Those proceedings were discontinued in Spring 2018.

In August 2018, Zhongshan initiated an arbitration proceeding against Nigeria under Article 9 of the Investment

---

[2] The arbitrator found that Nigeria collected over 160 million Nigerian Naira in tax revenue. J.A. 60. Using exchange rates from 2016, the year Zhongshan was evicted, that amount is between approximately 450,000 and 815,000 United States dollars. *See Nigerian Naira (NGN) to U.S. Dollar (USD) Exchange Rate History for 2016*, EXCHANGE-RATES.ORG, https://perma.cc/VPC9-5XW7.

Treaty. Nigeria willingly participated in the arbitration proceeding. Zhongshan alleged that Nigeria breached the Investment Treaty in five ways: (1) failure to afford Zhongshan fair and equitable treatment; (2) unreasonable discrimination; (3) failure to protect Zhongshan; (4) breach of contract; and (5) wrongful expropriation of investments without compensation.

In March 2021, an arbitral tribunal in the United Kingdom rendered a final award in favor of Zhongshan ("Final Award"). As relevant here, the tribunal found that Nigeria's actions in 2016 "were plainly designed to deprive, and indeed succeeded in depriving, [Zhongshan] of its rights under the [development agreement] in circumstances where there were no domestic law grounds for doing so," and did so "in a way which involved a combination of actual and threatened illegitimate use of the state's power to achieve that end." J.A. 60. In support of this conclusion, the tribunal identified violations of four separate provisions of the Investment Treaty. *See* J.A. 61–62 (identifying violations of Articles 2(2) (entitlement to "continuous protection" by Nigeria), 2(3) (protection against "unreasonable or discriminatory measures" by Nigeria), 3(1) (guarantee of "fair and equitable treatment" by Nigeria), and 4 (prohibition against expropriation by Nigeria)) (emphases omitted).

Based on these findings, the arbitral tribunal found that Nigeria had breached its obligations under the Investment Treaty and that Zhongshan was entitled to $55.6 million in compensation from Nigeria and $75,000 in moral damages, along with interest and legal and arbitral fees. J.A. 85–86.[3]

_____

[3] The arbitral tribunal defined "moral damages" to include damages for "injury inflicted resulting in mental suffering, injury to [the

After nearly a year of nonpayment by Nigeria, Zhongshan sued in the district court to enforce the arbitration award under the Federal Arbitration Act. Nigeria moved to dismiss for lack of subject-matter jurisdiction and personal jurisdiction. As relevant here, Nigeria argued that it was immune from suit because no FSIA exception applied to Zhongshan's petition to enforce the foreign arbitral award.

The district court denied Nigeria's motion to dismiss, holding that Nigeria was not immune because the Final Award was governed by the New York Convention, and so fell within the FSIA's arbitration exception.

## II

Nigeria timely appealed the district court's denial of its motion to dismiss. We have jurisdiction because a denial of sovereign immunity qualifies for interlocutory appeal under the collateral-order doctrine. *El–Hadad v. United Arab Emirates*, 216 F.3d 29, 31 (D.C. Cir. 2000).

We review the district court's denial of Nigeria's motion to dismiss *de novo*. *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000). When a plaintiff asserts jurisdiction under the FSIA, the defendant foreign state bears the burden of proving that the plaintiff's asserted statutory exception to immunity does not apply. *Belize Soc. Dev.*, 794 F.3d at 102.

---

claimant's] feelings, humiliations, shame, [and] degradation[.]" J.A. 63–64 (emphasis omitted) (quoting *Lusitania* (*United States v. Germany*), 7 R.I.A.A. 1, 40 (Mixed Claims Comm'n 1923)).

## III

We agree with the district court that the FSIA's arbitration exception stripped Nigeria of its sovereign immunity in this case.

The FSIA's arbitration exception requires the court to find the existence of three jurisdictional facts: (1) "an arbitration agreement"; (2) "an arbitration award"; and (3) "a treaty governing the award[.]" *Stileks*, 985 F.3d at 877. The first two requirements are not disputed in this case and are plainly established in the record. Nigeria and Zhongshan had an arbitration agreement because Nigeria extended an open offer to arbitrate to all Chinese investors, and Zhongshan was a qualifying investor. *See* Investment Treaty Art. 9; J.A. 44–45. Zhongshan then invoked that agreement to initiate an arbitration proceeding with Nigeria, and the arbitral tribunal rendered a final award in Zhongshan's favor.

Whether the arbitration exception applies in this case therefore turns on whether a treaty—specifically, the New York Convention—governs the Final Award. We hold that it does because the Final Award arose from (1) a legal relationship, (2) that is considered as commercial, and (3) is between persons. *See* New York Convention Art. I(1); 9 U.S.C. § 202.

## A

The Final Award satisfies the Convention's requirements that the arbitrated dispute (1) "aris[e] out of a legal relationship" that is (2) "considered as commercial[.]" 9 U.S.C. § 202.

12

**1**

As for the first requirement, Zhongshan and Nigeria shared a legal relationship because Nigeria owed Zhongshan legal duties under the Investment Treaty.

Two parties share a legal relationship within the meaning of the New York Convention if there is an agreement, whether contractual or not, that (1) "explicitly contemplate[s] which parties it w[ill] obligate"; (2) determines "the extent of the obligations"; and (3) provides "the legal framework to govern the arrangement." *Diag Human, S.E. v. Czech Republic Ministry of Health*, 824 F.3d 131, 135 (D.C. Cir. 2016).

The Investment Treaty fits that bill. First, the Investment Treaty expressly obligates Nigeria to protect investments made by Chinese investors, including those by Zhongshan. *See* Investment Treaty Art. 2(2) ("Investments of the investors of either Contracting Party shall enjoy the continuous protection in the territory of the other Contracting Party."); *see also* J.A. 44–45 (finding that Zhongshan was an investor under the Investment Treaty).

Second, the Investment Treaty lays out in precise terms the duties Nigeria owed to Zhongshan, including protecting Zhongshan's investments in Nigeria and affording Zhongshan the same treatment it would afford to Nigerian investors. Investment Treaty Arts. 2, 3; *see also id.* Art. 5 (providing that signatory states must compensate investors for certain kinds of losses); *id.* Art. 6 (requiring signatory states to ensure that investors can transfer their investments and returns).

Third, the Investment Treaty provides that the signatory states will arbitrate any disputes "connect[ed] with an investment" in the signatory states and specifies the governing

law that the tribunal shall apply. Investment Treaty Art. 9(1), (3), (7).

To be sure, the direct agreement was between China and Nigeria, not Nigeria and Zhongshan. But the Investment Treaty, on its face, committed to protect foreign investors and to treat them fairly. In that way, Nigeria assumed legally enforceable duties to Chinese investors, including Zhongshan.

More specifically, "a treaty is a contract," albeit one entered into between nations. *BG Group PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014); *Stileks*, 985 F.3d at 879 (quoting *BG Group*, 572 U.S. at 37). As relevant here, contract law has long permitted parties to contract for the benefit of a third party. Such "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." *See* RESTATEMENT (SECOND) OF CONTRACTS § 304 (AM. L. INST. 1981).

For that reason, the Supreme Court has "analyzed a similar bilateral investment treaty as if it were a contract between the sovereign and the investor corporation seeking to confirm an arbitral award." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 207 (D.C. Cir. 2015) (citing *BG Group*, 572 U.S. at 33–34).

So too for the Investment Treaty. China and Nigeria negotiated a treaty that was intended to confer specified benefits upon investors. The Investment Treaty expressly guarantees Chinese investors protection of their investments and fair and equal treatment. Investment Treaty Arts. 2–4. Underscoring the point, the duties owed to investors are distinct from those owed to the signatory states. That is evidenced by the fact that the Investment Treaty provides two distinct dispute-resolution mechanisms: one for investor-state

arbitrations, found in Article 9, and one for arbitrations between the signatory states, found in Article 8. If the Investment Treaty did not create rights in third-party investors, there would be no point to the distinct investor-state arbitration provision. Accordingly, as an investor, Zhongshan is an intended beneficiary of the Investment Treaty. Nigeria therefore owes Zhongshan a duty to perform Nigeria's promises, and Zhongshan has the right to enforce those promises through arbitration.

**2**

As for the second component of the commercial reservation, the legal relationship the Investment Treaty created between Zhongshan and Nigeria is commercial in nature. The relationship exists because Zhongshan made a commercial investment, in a free-trade zone designed to facilitate commerce, under a bilateral treaty aimed at promoting commercial investment and protecting commercial investors.

The Federal Arbitration Act and circuit precedent corroborate that straightforward reading of the Investment Treaty's character. Under the Federal Arbitration Act, the New York Convention applies to an arbitral award only if the award "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial[.]" 9 U.S.C. § 202.

The requirement that the relationship be considered commercial has a broad scope. A relationship "may be commercial even though it does not arise out of or relate to a contract, so long as it has a connection with commerce[.]" *Belize Soc. Dev.*, 794 F.3d at 104 (quoting RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMM. & INV.–STATE ARBITRATION § 1.1 cmt. e (AM. L. INST. 2012)). That reading

of "considered as commercial" maps onto the phrase's "established meaning as a term of art * * * [i]n the field of international arbitration[.]" *Diag Human*, 824 F.3d at 136.

Zhongshan and Nigeria's relationship has at least five commercial features.

First, Zhongshan's investment in a money-making enterprise is itself commercial.

Second, Zhongshan invested in a free-trade zone intended to promote commercial activity.

Third, Nigeria relaxed tariffs in the free-trade zone. Its decision to "forgo[] charging" those "duties" is connected to commerce. *Belize Soc. Dev.*, 794 F.3d at 104.

Fourth, Nigeria collected hundreds of thousands of dollars in tax revenue from Zhongshan's investment. *See* J.A. 60. "The[se] taxes * * * also have a connection with commerce[.]" *Belize Soc. Dev.*, 794 F.3d at 104.

Fifth, the Investment Treaty, under which Nigeria owed duties to Zhongshan, is expressly designed to promote commerce. By its own terms, the treaty is meant to "stimulat[e] business initiative of the investors and * * * increase prosperity in both States[.]" Investment Treaty preamble. In that same vein, the treaty ensures that investors can profit off their investments by guaranteeing them the ability to transfer "returns" on investments—including "profits, dividends, interests and other legitimate income" of a commercial character—back to their home countries. *Id.* Art. 6.

Nigeria does not dispute that the above connections to commerce exist. Instead, Nigeria argues that the commercial

reservation limits the New York Convention to arbitral awards arising from direct transactions between a signatory state and a private party. *See* Nigeria Opening Br. 44–47. Nigeria relies principally on the Federal Arbitration Act's requirement that the parties' relationship be "considered as commercial, including a transaction, contract, or agreement described in section 2 of this title[.]" 9 U.S.C. § 202. Section 2 of the Federal Arbitration Act, in turn, provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce" providing for arbitration "shall be valid, irrevocable, and enforceable[.]" 9 U.S.C. § 2; *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). Nigeria argues that, since Section 2 requires a "maritime transaction or a contract evidencing a transaction," and the commercial reservation cross-references Section 2, then the commercial reservation must also require a transaction. Because the Investment Treaty itself is not a commercial transaction, and Zhongshan did not directly transact with Nigeria itself, Nigeria argues that the relationship between Zhongshan and Nigeria is not considered as commercial for purposes of the commercial reservation.

Nigeria's proposed reading would artificially and extra-textually confine the commercial reservation to the scope of Section 2 of the Federal Arbitration Act. Specifically, Nigeria would replace the commercial reservation's use of the word "including" with the words "limited to," so that the reservation would read: "An * * * arbitral award arising out of a legal relationship * * * which is considered as commercial, *limited to* a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." *See* 9 U.S.C. § 202.

But that is not what Congress wrote. Because "the use of the word 'includes' indicates that [a statute's] list * * * is non-exhaustive[,]" Congress intended for the commercial

reservation to be broader than Section 2's reference to transactions. *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1115 (D.C. Cir. 2009).

Nigeria's argument also overlooks that Congress used the phrase "considered as commercial," not "considered as transactional." "When a statute uses a term of art" like the word "commercial[,]" "Congress intended it to have its established meaning." *Belize Soc. Dev.*, 794 F.3d at 103 (formatting modified). In the international arbitration context, the established meaning of "commercial" is anything that "has a connection with commerce," whether transactional or not. *Id.* at 104 (quoting RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMM. & INV.–STATE ARBITRATION § 1.1 cmt. e). For that reason, we have held that the commercial reservation is not confined to "state commercial and private acts[.]" *Id.* at 105 (quotation marks omitted). It instead has a "broad compass" and reaches anything with a connection to commerce. *Id.* at 104–105.

Without a foothold in the statutory text or this court's precedent, Nigeria argues that "considered as commercial" must be narrow because otherwise it would have little work to do, given that "[t]he vast majority of treaties are connected to commerce in one way or another." Nigeria Opening Br. 50–51. According to Nigeria, holding that the Investment Treaty is a commercial relationship covered by the Convention would mean that, "in all those treaties among sovereign nations that involve economic topics, the dispute resolution processes would lead to Convention enforcement." Nigeria Opening Br. 51.

Nigeria is mistaken for three reasons.

First, nothing in this opinion suggests that the Investment Treaty is itself a commercial relationship. Instead, the Investment Treaty created a relationship between Nigeria and the commercial investor Zhongshan to promote commercial development. It is that relationship between Nigeria and Zhongshan that is considered as commercial.

Second, not every treaty contains an agreement to arbitrate. Without a valid arbitration agreement, the FSIA's arbitration exception does not apply. *See Stileks*, 985 F.3d at 877. Countries that do not wish to arbitrate or to be subject to enforcement proceedings in foreign courts do not have to extend to commercial investors a standing offer to arbitrate like Nigeria did.

Third, not every treaty confers enforceable rights upon third parties. *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 850–851 (2014) (The Convention on Chemical Weapons "creates obligations only for State Parties" to ban chemical weapons.). Treaties that do not confer such rights will not create relationships between third parties and foreign sovereigns like the one that Zhongshan had with Nigeria.

Our holding in this case therefore does not, as Nigeria worries, reach "all those treaties among sovereign nations that involve economic topics[.]" Nigeria Opening Br. 51. Rather, our holding is limited to cases involving a treaty that (1) is connected with commerce; (2) confers third-party rights upon commercial investors; and (3) makes a standing offer to those commercial investors to arbitrate disputes involving their third-party rights. In those cases, the treaty creates a legal relationship between the parties that is commercial in nature, and an arbitral award arising from that relationship satisfies the commercial reservation.

**B**

The remaining requirement for the New York Convention to apply in this case—that the Final Award arise from a dispute between "persons"—is also met. *See* New York Convention Art. I(1). Under the Convention, the term "persons" includes a foreign state that has entered into a bilateral investment treaty under which it assumes treaty obligations owed to third parties that are connected to commerce.

Extensive precedent, from this court and others, has long enforced under the New York Convention arbitral awards involving foreign states charged with breaching investment and commercial treaty obligations. *See, e.g.*, *Tatneft v. Ukraine*, 21 F.4th 829, 832–834 (D.C. Cir. 2021) (affirming confirmation of arbitral award in favor of third-party investor arising from Ukraine's breach of bilateral investment treaty with Russia); *Stileks*, 985 F.3d at 874–876 (affirming confirmation of arbitral award in favor of third-party energy provider arising from Moldova's breach of multilateral treaty); *Chevron Corp.*, 795 F.3d at 202–203 (affirming confirmation of arbitral award in favor of third-party investor arising from Ecuador's breach of bilateral investment treaty with the United States); *Olin Holdings Ltd. v. State of Libya*, 73 F.4th 92, 96–101 (2d Cir. 2023) (affirming confirmation of arbitral award in favor of third-party investor based on Libya's breaches of bilateral investment treaty with the Republic of Cyprus); *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 70–71 (2d Cir. 2012) (affirming confirmation of arbitral award in favor of third-party investor based on Thailand's breaches of bilateral investment treaty with Germany); *cf. BG Group*, 572 U.S. at 28–31 (involving arbitral award in favor of third-party investor arising from Argentina's breach of bilateral investment treaty with the United Kingdom).

In each of those cases, enforcement was possible only if the breaching state was a "person" for purposes of the Convention. So too here. Nigeria, like the foreign states in each of those cases, signed a treaty and assumed obligations to private, third-party beneficiaries that are connected to commerce. And Nigeria, just like those foreign states, is a "person" under the Convention.

Nigeria argues that the Final Award does not fall within the scope of the New York Convention because "[a] sovereign is a 'person' for Convention purposes only when it engages in private activity." Nigeria Opening Br. 21. Claiming that it "acted solely as a sovereign with respect to Zhongshan[,]" Nigeria Opening Br. 30, Nigeria argues that the Final Award is not enforceable under the New York Convention.

Nigeria's proposed private-act limitation is without basis in the New York Convention's text or precedent, and it contradicts the position of the Executive Branch.

First, the Convention affords no textual footing for including foreign states as "persons" only when acting in a purportedly "private" capacity. The "interpretation of a treaty is like the interpretation of a statute," and so we "first look to the treaty's text." *Rodriguez v. Pan American Health Org.*, 29 F.4th 706, 717 (D.C. Cir. 2022) (formatting modified). Here, the plain text of the New York Convention leaves no room for a private-act limitation. Article I provides broadly that the Convention applies to all arbitral awards "arising out of differences between persons[.]" New York Convention Art. I(1). There is no dispute that the term "persons" includes foreign states, at least when they are acting in a commercial capacity. *See Report of the Comm. on the Enf't of Int'l Arbitral Awards* ¶ 24, U.N. Doc. E/AC.42/4 (Mar. 21, 1955) ("1955 Report"); *see also* RESTATEMENT (THIRD) OF THE FOREIGN

RELATIONS LAW OF THE U.S., Part II Introductory Note (AM. L. INST. 1987) ("The principal persons under international law are states."). And that commercial-activity limitation is expressly provided for in the Convention itself. New York Convention Art. I(3). That commercial reservation accomplishes much of what Nigeria's proposed "private-versus-public" distinction would but, unlike Nigeria's atextual distinction, it does so explicitly.

So Nigeria's position must be that, although the word "persons" encompasses foreign states, it does so only when those states act in a private capacity. Yet nothing in the Convention's text provides for such a bespoke limitation on signatory states' coverage.

The same is true for the Federal Arbitration Act. Section 202 of the Act provides: "An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, * * * falls under the Convention." 9 U.S.C. § 202. Apart from the requirement that the legal relationship be commercial, that provision does not place any additional private-act precondition on the enforcement of an arbitral award against a foreign state.

Nigeria, for its part, has identified no international-law basis for reading its additional private-act qualification into the Convention's text, nor has it pointed to any other signatory state that has asserted that cramped understanding of "persons" in the 66 years since the Convention's ratification. The dissenting opinion, meanwhile, offers dictionary definitions that cut against reading the word "persons" to encompass sovereigns *at all*. *See infra* at 7. But unwilling to bite that bullet, the dissenting opinion instead urges a non-dictionary reading of "persons" to mean "sovereigns sometimes, depending on how exactly the sovereign is behaving." Absent

any explicit textual indication, we hesitate to read such a partially-in and occasionally-out definition into the Convention's single use of the word "persons."

The dissenting opinion asserts that reading the Convention as-written would mean that foreign states "have *no* immunity" for their sovereign acts. *See infra* at 11. Not at all. What the dissenting opinion overlooks is that one essential attribute of sovereign immunity is foreign states' ability voluntarily to consent to a suit or proceeding. *See Franchise Tax Bd. of Calif. v. Hyatt*, 587 U.S. 230, 237–241 (2019) (describing founding-era principles of international law under which states could be sued only with their consent); *see also* RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE U.S. § 70 (AM. L. INST. 1965). The Convention applies to the enforcement only of arbitral awards resulting from arbitral proceedings in which the parties have voluntarily contracted to resolve a dispute through arbitration. *See* New York Convention Arts. II, IV(1)(b), V(1)(a).

Consistent with that long-established principle of foreign states' ability to consent to suits, the FSIA's arbitration exception requires that there have been an agreement by the foreign state to arbitrate and a final arbitral award. *Stileks*, 985 F.3d at 877. When those conditions are met, as they are here, then it is the FSIA's arbitration exception—not the Convention—that strips states of their immunity.

Nigeria did not have to agree to arbitrate with investors like Zhongshan. That was its decision to make. Had it not so agreed, it would be immune to this lawsuit. But Nigeria signed a treaty that expressly obligated it to arbitrate disputes with Chinese investors and arbitrated this dispute with Zhongshan. Nigeria also committed itself via the New York Convention to the enforcement of arbitral awards. While the Convention

covers an arbitral award regardless of whether the parties have acceded to the Convention, *see infra* at 13–14, accession to the Convention in part determines whether a state has consented to an award's enforcement in foreign courts. *See Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) (holding that Qatar had not waived its sovereign immunity because it had not signed the New York Convention). Because Nigeria has twice consented to the enforcement of this award, our reading of the New York Convention is consistent with long-established principles of sovereign immunity.[4]

The dissenting opinion also reasons that our reading of the Convention would undercut "[b]ackground principles of espousal[.]" *See infra* at 12. That is incorrect. Espousal requirements generally prohibit private parties from asserting claims arising under international law directly against foreign states (rather than petitioning their own governments to raise the claims state-to-state). *See* RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE U.S., § 174 cmt. b. But that prohibition does not apply where an international agreement expressly provides a mechanism for the resolution of disputes between a government and foreign nationals, or where a government *agrees* to resolve a dispute directly with a private party. *Simon v. Republic of Hungary*, 77 F.4th 1077, 1097 (D.C. Cir. 2023) (citing RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE U.S., § 175); *see also infra* at 12 (Espousal requirements do not apply "where the sovereign itself ha[s] agreed to engage directly with the aggrieved individual.").

---

[4] We do not address whether the district court had jurisdiction under the FSIA's waiver exception.

This case fits within both of those exceptions. Nigeria signed an investment treaty with China that expressly provided for either state's nationals to directly arbitrate against the other state. And Nigeria stood by that promise by arbitrating with Zhongshan. Enforcing the Final Award is therefore entirely consistent with espousal requirements.

Second, circuit precedent corroborates our straightforward reading of the Convention, as this court has found the New York Convention to be fully applicable to arbitral awards arising from sovereign acts. In *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021), we affirmed under the New York Convention the confirmation of an arbitral award in favor of a third-party investor arising from Ukraine's breach of a bilateral investment treaty with Russia, *id.* at 832–834. Ukraine's breaching conduct went far beyond any private conduct and involved core sovereign activity. The Russian company that initiated arbitration alleged that "Ukrainian courts, prosecutors, and court officials" had improperly facilitated a Ukrainian conglomerate's acquisition of the Russian company's shares in another company. *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 193 (D.D.C. 2018) (quotation marks omitted); *see Tatneft*, 21 F.4th at 832–833. Similarly, in *Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015), we confirmed an arbitral award against Ecuador for purely sovereign conduct—violating a bilateral investment treaty by "failing to resolve" lawsuits pending in Ecuadorian courts. *Id.* at 202–203; *cf. BG Group*, 572 U.S. at 28–31 (theory of arbitral award was not based on private conduct, but instead on finding that Argentina had enacted laws that denied company fair and equitable treatment as required by an investment treaty); *Olin Holdings*, 73 F.4th at 96–100 (arbitration award based in part on Libya's expropriation of factory).

Nigeria's breaching conduct in this case—including its expropriation of Zhongshan's investments—is no less sovereign than Ukraine's conduct in *Tatneft*, or Ecuador's conduct in *Chevron*. Those cases demonstrate that, contrary to the dissenting opinion's view, enforcing the Final Award would not mark a departure from settled norms or expectations. If anything, declining to enforce the Final Award would be a sharp break from past decisions. Notably, Nigeria makes no argument that those prior cases were wrongly decided even though the breaching conduct at issue involved sovereign, not private, acts.

Third, the United States government has agreed that the New York Convention governs the enforcement of an arbitral award even when the breaching conduct arises out of a foreign state's sovereign, rather than private, activities. In *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahirya*, 684 F.2d 1032 (D.C. Cir. 1981) (table), this court vacated without opinion a district court decision declining to enforce an arbitral award rendered against Libya. *See Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahirya*, 482 F. Supp. 1175, 1179 (D.D.C. 1980). The subject arbitration award had been rendered in favor of the Libyan American Oil Company under an arbitration clause contained in agreements into which the company had entered with Libya in 1955. *Id.* at 1176. Nearly two decades later, Libya nationalized the company's rights under the agreements, along with some of the company's oil-drilling equipment. *Id.* When negotiations for compensation faltered, the oil company rejected the terms of the nationalization and initiated arbitration proceedings, ultimately securing an arbitration award in its favor. *Id.*

In an amicus brief submitted to this court in *Libyan American Oil*, the United States argued that Libya's

Convention-related "objections to enforcement [could] be briefly dismissed." Brief for the United States as Amicus Curiae at 20 n.16, *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahiriya*, Nos. 80-1207, 80-1252 (D.C. Cir. June 16, 1980). The United States explained that the fact that a party seeks to enforce an arbitral award against a "sovereign state rather than a private party does not affect the enforceability of an award * * * under the New York Convention." *Id*. The government explained that the "negotiating history of the Convention clearly reflects the interpretation that states are legal persons for the purposes of the Convention." *Id.*

In so arguing, the United States endorsed enforcement of the arbitral award against Libya as a covered "person" under the Convention even though Libya's breaching conduct involved sovereign acts committed within its own territory. *See* Brief for the United States as Amicus Curiae at 4, 6–8, *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahiriya*, Nos. 80-1207, 80-1252 (D.C. Cir. June 16, 1980). The United States also perceived no separation-of-powers concerns with enforcement because enforcement "solely concern[ed] Libya's undertaking to submit disputes under freely negotiated concession contracts to final and binding arbitration outside of its territory, and to honor any ensuing awards." *Id*. at 7. In giving effect to such awards, the United States explained, courts simply "enforce a judgment to which the foreign state has consented in advance," consistent with longstanding principles allowing litigation in which the sovereign has agreed to participate. *Id*. at 8. That "element of consent, coupled with the neutrality of the arbitral tribunal, removes any concern that domestic courts might venture into the political arena, or hinder the United States' pursuit of foreign policy goals." *Id.*

Given the Executive Branch's constitutional expertise in matters of foreign affairs and diplomacy, we afford the United States' interpretation of the Convention "great weight." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 355 (2006) (quotation marks omitted); *see id.* ("[W]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.") (quotation marks omitted).

Fourth, subsequent treaties involving foreign states signatory to the New York Convention have treated the New York Convention as encompassing arbitral awards arising from sovereign acts. For example, the Energy Charter Treaty, *opened for signature* Dec. 17, 1994, 2080 U.N.T.S. 95, is a multilateral treaty that establishes a framework to "promote long-term co-operation in the energy field," Energy Charter Treaty Art. 2. The Energy Charter Treaty includes an arbitration provision for disputes "between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former[.]" *Id.* Art. 26(1); *see id.* Art. 26(2)–(8). The treaty further provides that claims submitted to arbitration under the treaty "shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of th[e New York] Convention." *Id.* Art. 26(5)(b). While certain disputes between a contracting state and an investor could involve foreign states' private acts, *see, e.g.*, *id.* Art. 10(1) ("Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."), other covered disputes explicitly involve foreign states acting in their sovereign capacity, *see, e.g.*, *id.* Art. 13(1) (prohibiting signatory states from engaging in certain forms of expropriation and nationalization).

That over 50 of the state signatories to the New York Convention entered a treaty that contemplates that arbitral awards fall within the New York Convention even when they plainly arise from a state's sovereign acts underscores that the Convention does not impose a private-act precondition on a foreign state qualifying as a covered "person." Even if the Energy Charter Treaty did not amend the New York Convention, *see infra* at 25, it evidences "[t]he postratification understanding of other contracting states" that "may * * * serve as an aid to our interpretation of a treaty's meaning[.]" *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 442 (2020) (quotation marks omitted); *see also* Zhongshan Br. 28 & n.9 (noting that 51 of 53 states signatory to the Energy Charter Treaty are also parties to the New York Convention).

Nigeria's arguments in support of its position that foreign states are "persons" under the New York Convention only when they act in their private capacity do not hold up.

To start, Nigeria contends that, "[a] mere eight years after the Convention, many countries adopted the International Centre for Settlement of Investment Disputes Convention [("ICSID")] specifically for investor-state disputes." Nigeria Reply Br. 8. Nigeria argues that "[f]or so many Convention signatories to develop a new and different treaty on this point suggests investor-state disputes were not generally subject to the Convention—which would have made the new treaty unnecessary." Nigeria Reply Br. 8–9.

Not so. ICSID promotes international investment by establishing a *dispute-resolution process* for investor-state disputes. *See Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510, 513 (D.C. Cir. 2023). The New York Convention, on the other hand, provides for the

recognition and enforcement of a broad array of foreign arbitral awards. The two agreements accordingly serve distinct functions in the arbitration of investment disputes. In any event, any supposed redundancy between the Convention and ICSID would persist even under Nigeria's reading: Nigeria agrees that the New York Convention applies to awards arising out of foreign states' private acts, Nigeria Opening Br. 21, even though the ICSID itself covers such awards.

Nigeria also argues that the drafting history (*travaux préparatoires*) of the New York Convention shows that the countries developing the Convention intended the treaty to "appl[y] to government bodies only to the extent they are engaged in the private sphere." Nigeria Opening Br. 22; *see* Nigeria Opening Br. 22–25.

That is incorrect. The "clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Rodriguez*, 29 F.4th at 718 (quotation marks omitted); *cf. Air France v. Saks*, 470 U.S. 392, 399 (1985) ("[I]t is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."). Here, nothing in the text of the New York Convention even hints at the private-act prerequisite that Nigeria proposes.

In addition, the handful of quotes from a 1955 Report of the Committee on the Enforcement of International Arbitral Awards on which Nigeria bases its *travaux préparatoires* argument does not suggest that the signatories intended that arbitral awards against states be covered only when those awards arise from private state acts.

Nigeria first notes that the 1955 report explained that the New York Convention would "go[] further than the Geneva Convention in facilitating the enforcement of foreign arbitral awards, [while] at the same time * * * respect[ing] the sovereign rights of States." 1955 Report ¶ 14; *see* Nigeria Opening Br. 23. But that broad reference to sovereign "rights" is too general to import a drastic and categorical limitation on enforcement whenever the breaching conduct underlying an arbitral award is sovereign action. After all, the Convention already protects sovereign rights in multiple respects, including by allowing for commercial reservations. In addition, as the United States has explained, sovereign rights are safeguarded where, as here, a sovereign voluntarily joins the New York Convention and then freely consents to arbitrate with third parties, and any subsequent arbitration proceeds before a neutral arbitral tribunal. *See* Brief for the United States as Amicus Curiae at 7–8, *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahiriya*, Nos. 80-1207, 80-1252 (D.C. Cir. June 16, 1980).

Nigeria next points to language in the 1955 report stating that the New York Convention "does not deal with arbitration between States[.]" 1955 Report ¶ 17; *see* Nigeria Opening Br. 23. From that, Nigeria reasons that "[i]f sovereign governments were 'persons' for all purposes under the Convention, an arbitration between States would be a dispute between 'persons,' so this statement * * * would have been contrary to the committee's own drafting work." Nigeria Opening Br. 23–24.

Nigeria's argument, however, omits relevant context. The relevant paragraph reads in full:

> The Committee considered that the expression "International Arbitral Awards" used by the

> International Chamber of Commerce (E/C.2/373)
> normally referred to arbitration between States. Since
> this Draft Convention does not deal with arbitration
> between States, but deals with the recognition and
> enforcement in one country of arbitral awards made
> in another country, the Committee adopted the title
> "Draft Convention on the Recognition and
> Enforcement of Foreign Arbitral Awards" which
> reflects more accurately the object of the Convention.

1955 Report ¶ 17.

When read in full, then, the language that Nigeria references is indeterminate. It is not clear whether the New York Convention's drafters were explaining that the Convention is not focused on arbitrations between states or were noting that the Convention specifically excludes such arbitrations. We do not resolve that ambiguity here, for there are at least two things that may distinguish arbitration between states and this arbitration between Nigeria and Zhongshan.

For one, as the dissenting opinion points out, there is other evidence from the drafting history suggesting that the Convention does not apply to disputes between states over violations of international law. *See infra* at 14–17.

For another, disputes between states are ordinarily governed by public international law, while disputes between states and individuals are not. *See Federal Republic of Germany v. Philipp*, 592 U.S. 169, 176 (2021); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE U.S. § 487 cmt. f; *id.* § 904 cmt. a. To that point, the arbitration between Nigeria and Zhongshan was governed by "the law of Nigeria as supplemented by international law as provided by article 9.7" of the Investment Treaty. J.A. 40; *see* J.A. 60 (finding

Nigeria liable because "there were no domestic law grounds" for Nigeria's actions against Zhongshan); Investment Treaty Art. 9(7) ("The tribunal shall adjudicate in accordance with the law of the Contracting Party to the dispute * * * as well as the generally recognized principles of international law[.]"); *see also id.* Art. 4(1)(b) (prohibiting expropriation by Nigeria and China without "domestic legal procedure"). Nothing in the *travaux préparatoires* bars enforcement of arbitral awards resulting from state–private disputes that are governed in material part by domestic law.

So regardless of whether a dispute between two sovereign states governed purely by public international law falls under the New York Convention, for our purposes, it is sufficient that nothing in the Convention's drafting history establishes that the Convention is categorically inapplicable to an arbitration that implicates a single state's sovereign activity directed at a non-state entity and that is governed, in part or in whole, by domestic law.

Nigeria next points to part of the 1955 report that, in Nigeria's view, "specifically explained what the 'differences between persons' clause means, with respect to governmental bodies." Nigeria Opening Br. 24. In particular, Nigeria notes that Belgium had "proposed that the clause 'should expressly provide that public enterprises and public utilities should be deemed to be legal persons for purposes of this article if their activities were governed by private law.'" Nigeria Opening Br. 24 (quoting 1955 Report ¶ 24). Nigeria then notes that "[t]he Committee was of the opinion that such a provision would be superfluous and that a reference in the [1955 Report] would suffice." Nigeria Opening Br. 24 (quoting 1955 Report ¶ 24). In Nigeria's view, this "'reference' * * * makes clear that governmental bodies can be legal persons but only to the extent

they are operating in the private sphere[.]" Nigeria Opening Br. 24.

But Nigeria overlooks other statements in the *travaux préparatoires* that contradict its proposed reading. For example, a 1956 report by the Secretary General about an early draft of the Convention contained the following statement from Austria:

> Since the term 'legal persons' includes States, the draft convention seems admittedly to cover arbitral wards [*sic*] made in their favour or against them in cases of disputes with subjects of private law. Nevertheless, it would be desirable to provide expressly that the convention is also applicable in cases in which corporate bodies under public law, and particularly States, in their capacity as entities having rights and duties under private law, have entered into an arbitration convention for the purpose of the settlement of disputes.

*Report by the Secretary-General on the Recognition and Enforcement of Foreign Arbitral Awards*, at Annex I, 11, U.N. Doc. E/2822 (Jan. 31, 1956).

Viewed from Austria's perspective, the Final Award qualifies for enforcement. Nigeria has "entered into an arbitration convention for the purpose of the settlement of disputes" with private, third-party beneficiaries. *Report by the Secretary-General on the Recognition and Enforcement of Foreign Arbitral Awards*, at Annex I, 11. An arbitral proceeding under that convention resulted in an arbitral award arising from Nigeria's dispute with Zhongshan, a "subject[] of private law." *Id.* Austria's commentary thus refutes Nigeria's claim that the New York Convention excludes arbitral awards

arising under arbitration conventions simply because "[a] treaty is obviously a sovereign, not a commercial, act." Nigeria Opening Br. 32; *see* Nigeria Opening Br. 32–33. And nothing in Austria's comment suggests that such awards fall outside of the Convention when the breaching conduct on which they are based is sovereign in nature.[5]

The same 1956 Secretary General report also contains the following statement from the Society of Comparative Legislation:

> The following words should be added after the words 'persons whether physical or legal' at the end of paragraph 1: 'this expression to include States, public bodies and undertakings (collectivités publiques), public establishments and establishments serving the public interest, on the condition that the said differences arose out of a commercial contract or a private business operation (acte de gestion privée).'

*Id.* at Annex II, 9; *see id.* at Annex II, 10. This commentary appears to express the broad view that the Convention encompasses arbitral awards involving foreign states so long as those awards are based on disputes arising out of private business operations. It does not, on its face, require that the

---

[5] The dissenting opinion notes that Austria was not part of the drafting committee that first drafted the New York Convention. *Infra* at 17. But Austria was a member of the committee that drafted the *final* version of the Convention. *See Final Act and Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, at 3, U.N. Doc. E/CONF.26/8/Rev.1 (1958). Indeed, the dissenting opinion cites to materials from the committee of which Austria was a member. *See, e.g.*, *infra* at 17 (citing *Summary Record of the Sixteenth Meeting*, at 5, U.N. Doc. E/CONF.26/SR.16 (June 3, 1958)).

state itself entered into a commercial contract. And, like the commentary from Austria, it does not require that the breaching conduct be non-sovereign in nature. As such, under the Society of Comparative Legislation's view, the New York Convention would encompass the award at issue here, which involved a dispute related to Zhongshan's private business operations.[6]

In short, contrary to Nigeria's claim, the Convention's drafters did not "plainly" state an "intent[]" to carve sovereign-act breaches against a private entity out of the New York Convention's scope and to categorically constrict the Convention's coverage to private acts. Nigeria Opening Br. 25. The "[c]herry-picked generalizations from the negotiating and drafting history" that Nigeria cites "cannot be used to create a rule that finds no support in the treaty's text." *GE Energy Power Conversion France SAS*, 590 U.S. at 442 (formatting modified). In the absence of a contrary consensus, the New York Convention's uncabined text controls. *See Rodriguez*, 29 F.4th at 718 ("[T]he clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.") (quotation marks omitted).

Lastly, Nigeria's reliance on non–New York Convention case law does not help its cause. Nigeria marches through a series of cases in which federal courts have interpreted the term "persons" to exclude states acting in their sovereign capacity. *See, e.g.*, Nigeria Opening Br. 21–22, 25–26 (discussing False Claims Act and Sherman Act cases). But the meaning of the

---

[6] Nigeria's other drafting-history arguments—some of which are raised for the first time only in its reply brief, *see, e.g.*, Nigeria Reply Br. 13–16—fail for similar reasons. Each of the passages to which Nigeria points is subject to multiple interpretations, and none announces a categorical private-act limitation.

term in *domestic* statutes does not provide insight into the "shared expectations" of contracting states regarding the meaning of a term in an *international* treaty. *Air France*, 470 U.S. at 399. Moreover, any domestic-law presumption against treating states as persons fades when a state consents to a suit, like Nigeria did when it consented to arbitration after having already joined the New York Convention. *Cf. Alden v. Maine*, 527 U.S. 706, 755 (1999) (State "sovereign immunity bars suits only in the absence of consent.").

Nigeria's act-of-state-doctrine cases are particularly inapposite. Under the act-of-state doctrine, "the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Altmann*, 541 U.S. at 700. Cases invoking that doctrine are of no relevance in a suit to enforce an arbitral award under the New York Convention because the Federal Arbitration Act specifically provides that "[e]nforcement of arbitral agreements * * * shall not be refused on the basis of the Act of State doctrine." 9 U.S.C. § 15. Although the relevant provision of the Act is not located in the chapter implementing the New York Convention, it applies to actions brought under the Convention unless it is "in conflict" with the Convention as ratified. *Id.* § 208. No such conflict exists. Moreover, in extending that part of the Federal Arbitration Act to the codification of the New York Convention, the Political Branches further evidenced that arbitral awards against foreign states for their sovereign acts— their acts of state—would be enforced in United States courts, including in disputes with private parties. *See Altmann*, 541 U.S. at 700; *see also, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 439 (1964) (holding, in a dispute between a Cuban government instrumentality and a private

party, that the act-of-state doctrine barred a challenge to a Cuban expropriation decree); *Underhill v. Hernandez*, 168 U.S. 250, 253–254 (1897) (holding, in a suit by a private citizen against a foreign state's military officer, that the act-of-state doctrine barred a challenge to the state's military operations).

In sum, this court has repeatedly enforced under the New York Convention arbitral awards arising from foreign states' sovereign acts that breach obligations owed to a third-party investor under an investment treaty. Neither the New York Convention nor the Federal Arbitration Act textually imposes a private-act qualification on the scope of "persons" against whom an arbitral award can be enforced. And both the United States government and subsequent treaties have taken the position that the Convention imposes no such limitation. Against those headwinds, Nigeria and the dissenting opinion offer only vague and indeterminate passages from the Convention's *travaux préparatoires*. Those passages are insufficient to impose a limitation not found in the New York Convention's plain text or this court's history of enforcing arbitral awards under the Convention.

**IV**

For the foregoing reasons, we hold that the Final Award is enforceable under the New York Convention because it arose out of differences between "persons" that share a legal, commercial relationship. The district court therefore has jurisdiction over this case under the FSIA's arbitration exception. The judgment of the district court is affirmed.

*So ordered.*

KATSAS, *Circuit Judge*, dissenting: The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly known as the New York Convention, requires signatory countries to enforce foreign arbitral awards arising out of "differences between persons, whether physical or legal." In its typical applications, the New York Convention governs awards arising from disputes between private parties. This case presents the question whether the Convention also governs awards arising from public-law disputes involving the sovereign acts of governments. In my view, the Convention's reference to "persons" does not extend to states acting in their sovereign capacity. Because my colleagues conclude otherwise, I respectfully dissent.

I

A

The New York Convention is a multilateral treaty that was adopted in 1958. It requires state parties to recognize and enforce arbitral awards made in other countries and "arising out of differences between persons, whether physical or legal." N.Y. Convention art. I(1). Its "goal" was "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). Parties may limit the Convention to disputes "considered as commercial" under their domestic law. N.Y. Convention art. I(3). Parties also may limit the Convention to awards made in the territory of another contracting state. *See id.* In 1970, the United States acceded to the Convention subject to both reservations. *See* An Act to Implement the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Pub. L. 91-368, 84 Stat. 692 (July 31, 1970).

Before 1976, federal courts deferred to executive-branch determinations of foreign sovereign immunity. *See Ex parte*

*Republic of Peru*, 318 U.S. 578, 589 (1943). Although foreign sovereigns could raise immunity themselves, they often would request the Department of State to file suggestions of immunity. Restatement (Second) of the Foreign Relations Law of the United States § 71(1)–(2) & cmt. a (Am. L. Inst. 1965) (Second Restatement). In the absence of any such suggestion, courts decided whether immunity applied in light of previous executive-branch determinations. *See Republic of Mexico v. Hoffman*, 324 U.S. 30, 34–35 (1945). Making these determinations taxed the State Department, and courts struggled in cases where it was not involved. *See* Restatement (Third) of the Foreign Relations Law of the Unites States Part IV.5.A intro. note (Am. L. Inst. 1987) (Third Restatement).

In 1976, Congress enacted the Foreign Sovereign Immunities Act (FSIA), Pub. L. No. 94-583, 90 Stat. 2891, which requires courts to determine immunity under uniform standards. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023). The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States," subject to specific exceptions. 28 U.S.C. § 1604. One of the exceptions addresses arbitral awards. As relevant here, it withdraws immunity in actions brought to confirm awards made under arbitration agreements if "the agreement or award is or may be governed by a treaty … in force for the United States calling for the recognition and enforcement of arbitral awards." *Id.* § 1605(a)(6). All agree that the New York Convention is such a treaty. So, if the Convention applies to an arbitral award, then the FSIA abrogates sovereign immunity in an action to recognize and enforce the award.

3

B

This case arises out of a 2001 bilateral investment treaty (BIT) between the Federal Republic of Nigeria and the People's Republic of China. Each country promised to encourage investments in its territory from investors of the other country. *See* Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments art. 2(1) (2001) (Nigeria-China BIT). Each country also made various promises about how it would treat such investments. As relevant here, Nigeria promised to afford "continuous protection" to investments of Chinese investors, *id.* art. 2(2); to refrain from taking "unreasonable or discriminatory measures" against such investments, *id.* art. 2(3); to afford "fair and equitable treatment" to such investments, *id.* art. 3(1); and to not "expropriate" such investments without fair compensation, *id.* art. 4(1). China made reciprocal promises.

The BIT also provided for the arbitration of two categories of disputes. Article 8 governed disputes between Nigeria and China over the interpretation or application of the BIT. It required such disputes to be settled through diplomatic channels or, if diplomacy failed, through arbitration. Nigeria-China BIT art. 8(1)–(2). Article 9 governed investment disputes between one of the signatories and investors of the other. It required disputes to be settled through negotiations or, if they failed, through domestic courts of the allegedly offending state or through arbitration. *Id.* art. 9(1)–(3). Nigeria and China agreed that any arbitral decision would be "final and binding" and that both countries would "commit themselves to [its] enforcement." *Id.* art. 9(6).

4

C

Ogun State is a Nigerian state, and Zhongshan Fucheng Industrial Investment Co. Ltd. was a Chinese investor in Nigeria. Through various contracts, Ogun State granted Zhongshan's predecessor-in-interest the right to develop and operate a large industrial park. Zhongshan developed the park.

Ogun State and Zhongshan then had a falling out. Ogun State claimed that Zhongshan had not validly acquired any interest in the project. It warned two Zhongshan executives to leave the country or else face "forceful removal, complications, and possible prosecution." J.A. 34 (cleaned up). It asked Nigeria to collect the immigration papers of Zhongshan employees. And it obtained arrest warrants against two Zhongshan executives. *Id.* at 35. One executive was "arrested at gunpoint, … deprived initially of food and water, intimidated, physically beaten, and detained for a total of ten days." *Id.* Eventually, both executives fled the country.

Zhongshan sued Ogun State and others in Nigerian courts. The defendants never responded, and the courts dismissed the cases. Zhongshan also sought arbitration with Ogun State in Singapore, but the High Court of Ogun State enjoined it.

Zhongshan then sought arbitration with Nigeria under the BIT. A London tribunal unanimously ruled in Zhongshan's favor and awarded it around $70 million plus interest. The tribunal reasoned that Ogun State's sovereign actions were attributable to Nigeria under international law. J.A. 42–44. It concluded that Zhongshan's previous lawsuits did not preclude arbitration, in part because they had raised contract claims, whereas the arbitration rested solely on the BIT. *Id.* at 46–49. The tribunal then determined that Nigeria's actions—actual and imputed—violated the BIT. *Id.* at 60–62. An English court recognized the award, but Nigeria refused to pay it.

Zhongshan petitioned the district court to recognize and enforce the award under the New York Convention. To overcome immunity, Zhongshan invoked the arbitration exception to the FSIA. Nigeria moved to dismiss and claimed that the Convention did not govern the award.

The district court denied the motion to dismiss. It held that the Convention covered the award because the BIT gave Zhongshan rights against Nigeria and because the award was connected to Zhongshan's commercial investment. *Zhongshan Fucheng Indus. Inv. Co. v. Federal Republic of Nigeria*, No. 22-170, 2023 WL 417975, *8–9 (D.D.C. Jan. 26, 2023). Nigeria objected that the New York Convention applied to contract claims, but not treaty claims, against sovereigns. Rejecting that argument, the court invoked what it called "the common practice of confirming arbitral awards" based on "a sovereign state's violation of a treaty created under public international law." *Id.* at *7.

## II

When interpreting treaties, "we begin with the text of the treaty and the context in which the written words are used." *Water Splash, Inc. v. Menon*, 581 U.S. 271, 276 (2017) (cleaned up). We are further "guided by principles similar to those governing statutory interpretation." *Collins v. NTSB*, 351 F.3d 1246, 1251 (D.C. Cir. 2003) (cleaned up). And "other general rules of construction may be brought to bear on difficult or ambiguous passages." *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991) (cleaned up). Interpreting an old legal text requires us to "orient ourselves to the time of … adoption," here 1958. *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020).

Nigeria argues that the FSIA's immunity exception does not apply because the New York Convention does not govern

arbitral awards against sovereigns for the alleged violation of treaties or other public international law. In the arbitration, Zhongshan alleged that Nigeria, either directly or through Ogun State, violated the BIT by denying it protection, discriminating against it, denying it fair and equitable treatment, and expropriating its property without fair compensation. The tribunal concluded that the *public*, treaty-violating actions taken by Ogun State were attributable to Nigeria under international law, and Nigeria does not contest that conclusion here. Ogun State also acted in a commercial capacity with Zhongshan, but the tribunal did not attribute Ogun State's *private* acts to Nigeria. Under international law, those private acts would not be attributable to Nigeria absent either an agency relationship or a need to prevent fraud or injustice. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622, 628–30 (1983). There is no evidence that either of these exceptions applies here. *See AG Abia v. AG Federation*, (2006) 16 NWLR part 1005, 265 (Nigeria) (state and federal governments in Nigeria are "autonomous" and thus "free from direction" by one another). In any event, Zhongshan bore the burden of establishing a basis for attributing Ogun State's private acts to Nigeria, *see GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 605 (D.C. Cir. 2016), and it expressly disclaimed this point, *see* Zhongshan Br. at 35 n.10.

Because Ogun State's private acts cannot be attributed to Nigeria, the award arises solely out of Nigeria's sovereign acts governed by public international law. So the immunity question boils down to whether the New York Convention applies to awards based exclusively on such sovereign acts. That in turn depends on whether the term "persons," as used in the New York Convention, includes governments acting in their sovereign capacity under public law. The common meaning of that term, the legal context in which the Convention

was written, and its drafting history all indicate that "persons" does not cover governments acting as sovereigns.

A

When the Convention was drafted, the word "person" did not typically include sovereigns. It always included natural persons, sometimes included juridical persons such as corporations or state-created entities like counties, and did not usually include sovereign states themselves. Black's Law Dictionary explained that, as a general matter, a "county is a person in a legal sense, but *a sovereign is not*." *Person*, Black's Law Dictionary 1300 (4th rev. ed. 1968) (emphasis added) (citation omitted). Webster's Dictionary likewise stated that "person" generally includes "any individual or *incorporated group* having certain legal rights and responsibilities"—a formulation that does not encompass sovereigns. *Person*, Webster's New World Dictionary 1092 (College ed. 1960) (emphasis added). And Congress codified a similar interpretive presumption across all federal statutes. It specified that "unless the context indicates otherwise," the word *person* "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; *see* Act of June 25, 1948, Pub. L. No. 80-772 § 6, 62 Stat. 683, 859. That is a long list of included entities, from which governments are conspicuously absent.

The Supreme Court confirmed this understanding around the time of the New York Convention. In *United States v. United Mine Workers of America*, 330 U.S. 258 (1947), it explained that "[i]n common usage," the word *persons* "does not include the sovereign," so "statutes employing it will ordinarily not be construed to do so." *Id.* at 275. This linguistic usage had settled long before the Convention was adopted, *see*, *e.g.*, *United States v. Cooper Corp.*, 312 U.S. 600, 603–05

(1941); *United States v. Fox*, 94 U.S. 315, 321 (1877), and it has persisted ever since, *see*, *e.g.*, *Return Mail, Inc. v. USPS*, 587 U.S. 618, 626–27 (2019); *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780–81 (2000); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989).[1]

That said, "there is no hard and fast rule" excluding sovereigns from the meaning of "person." *Cooper*, 312 U.S. at 604–05. But the presumption against including sovereigns "may be disregarded only upon some affirmative showing of … intent to the contrary." *Stevens*, 529 U.S. at 781; *see Cooper*, 312 U.S. at 606. Standing alone, the word "person" in a legal text "applies to natural persons, and also to artificial persons," but it "cannot be so extended as to include within its meaning" a sovereign without "an express definition to that effect." *Fox*, 94 U.S. at 321.

The presumption against including sovereigns is strongest for official acts. When sovereigns act in their private capacity, context is more likely to indicate that they are included in the word "person." *See Georgia v. Evans*, 316 U.S. 159, 161–62 (1942); *see also California v. United States*, 320 U.S. 577, 585–86 (1944). But for public acts, the presumption against including sovereigns is stronger—especially when the statute at issue imposes burdens as opposed to benefits. *Parker v. Brown*, 317 U.S. 341, 351–52 (1943); *see also Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979); *United States v. Knight*, 39 U.S. (14 Pet.) 301, 315 (1840). So, courts sometimes construe words like "person" to cover sovereigns acting in a proprietary capacity but not in a sovereign capacity. For example, the Supreme Court has held that states are

---

[1] British usage was similar. A prominent legal dictionary explained that in the legal context, "person" presumptively included corporations but excluded the Crown and other official offices. *Person*, Stroud's Legal Dictionary 1463–65 (2d ed. 1903).

"persons" under the Sherman Act when buying goods, *Evans*, 316 U.S. at 161–62, or when conducting "private anticompetitive behavior" and thus not "acting as sovereign," *Goldfarb v. Va. State Bar*, 421 U.S. 773, 790–92 (1975). In contrast, states are not "persons" under the Sherman Act when acting as regulators, *Parker*, 317 U.S. at 351–52, or otherwise "wielding the State's power," *Bates v. State Bar*, 433 U.S. 350, 360 (1977). Likewise, construing the Robinson-Patman Act, the Court has held that states are "persons" when "competing against private enterprise," but has reserved whether they are "persons" when performing public acts. *Jefferson Cnty. Pharm. Ass'n v. Abbott Lab'ys*, 460 U.S. 150, 153–154 (1983); *see also Will*, 491 U.S. at 64 n.5.

My colleagues brush aside this "series of cases" as involving only "*domestic* statutes" rather than treaties. *Ante* at 35–36. But in interpreting treaties, "general rules of construction may be brought to bear on difficult or ambiguous passages." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988). And here, ordinary English usage is particularly relevant because the Convention was drafted in English and finalized in New York City. Despite invoking the assertedly "plain text" of the Convention, *ante* at 20, my colleagues offer no affirmative textual argument that it uses "persons" in an unusual way to include governments acting as sovereigns. So while legal and historical context may show that the Convention covers foreign states acting in a private capacity—a point addressed below—text strongly indicates that it does not cover foreign states acting as sovereigns.

B

The legal context in which the Convention was adopted, including background international-law understandings of sovereign immunity and espousal, make it especially

implausible that the Convention's use of "persons" sweeps in foreign states acting in their sovereign capacity.

1

In 1958, countries disagreed about how broadly to grant immunity to foreign sovereigns. The traditional theory was that one sovereign should be immune from the domestic courts of another for *all* of its acts—public and private. *See The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136–37 (1812). The United States took this position, extending "virtually absolute immunity to foreign sovereigns," for more than a century and a half. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). But a few countries— including Belgium and Italy—had already rejected it. They believed that a sovereign should be treated as a private party when it acts as a private party, such as when it engages in commercial transactions. Letter from Jack B. Tate, Acting Legal Adviser of the U.S. Dep't of State, to Acting Attorney General Philip B. Perlman (May 19, 1952) (*Tate Letter*), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 713 (1976); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614–15 (1992). Yet they still granted immunity for governmental acts—those only a sovereign may undertake, such as operating military or police forces. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360–62 (1993); *Tate Letter*, 425 U.S. at 711. This view is known as the restrictive theory of sovereign immunity. *See Verlinden*, 461 U.S. at 487.

Throughout the 1900s, as sovereigns increasingly became involved in international commerce, more countries adopted the restrictive theory. *See Tate Letter*, 425 U.S. at 711–14. In 1952, the Acting Legal Adviser of the State Department embraced it. *See id.* at 714–15. Even so, the United States continued in some cases to recognize immunity for the private

acts of foreign sovereigns. *See* Third Restatement, *supra*, Part IV.5.A intro. note & n.11 (collecting cases). As late as 1965, this immunity question remained unsettled in U.S. courts. *See* Second Restatement, *supra*, § 69 n.1. And Congress did not adopt the restrictive theory until 1976, nearly two decades after the New York Convention. *See Verlinden*, 461 U.S. at 488.

Other countries lagged farther behind. Many still recognized absolute immunity during the 1950s—including Poland and the Soviet Union, original signatories of the Convention. *See Tate Letter*, 425 U.S. at 712, 714. Only decades later did the Council of Europe and the International Law Commission officially embrace the restrictive theory, in 1972 and 1986 respectively. *See* Third Restatement, *supra*, Part IV.5.A. intro. note.

In sum, when the Convention was drafted, there was an ongoing worldwide debate about whether countries should *always* be immune from the domestic courts of other countries or whether they should be immune only for their *sovereign* acts. Nobody suggested that states should have *no* immunity. And some countries that still embraced the traditional, absolute theory of immunity also signed the Convention. In this legal and historical context, with no clear text or contemporaneous mention of fundamentally altering the scope of foreign sovereign immunity, mere use of the word "persons" cannot be deemed to reach the governmental acts of foreign sovereigns. Just as Congress does not hide elephants in mouseholes, *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001), neither do treaty negotiators. And if the Convention did have the revolutionary effect that Zhongshan claims, then surely *someone*, from among the many nations and individuals negotiating the treaty, would have at least mentioned it. *See Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 17–18 (1987).

2

Background principles of espousal, like background principles of immunity, are also instructive. Zhongshan posits that the Convention permits enforcement of claims against one sovereign by private parties who are nationals of another. But the "traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 176–77 (2021) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422 (1964)). Thus, if one sovereign violated public international law and thereby harmed a national of another, it committed a legal wrong *against the second sovereign*. *See id.* The aggrieved private party could have asked its home country to espouse a claim against the offending sovereign, but it could not have pursued any international claim itself. Second Restatement, *supra*, § 174 cmt. b; *see also* Bradley & Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815, 831–32 & n.106 (1997), *quoted in Philipp*, 592 U.S. at 176–78. The only exceptions to this general rule—allowing private individuals to raise international claims against offending sovereigns— involved rare instances where the sovereign itself had agreed to engage directly with the aggrieved individual. *See* Second Restatement, *supra*, § 175. Moreover, these rare instances mostly involved early treaties in the discrete area that we now call international humanitarian law. *See Philipp*, 592 U.S. at 177–78; Second Restatement, *supra*, § 175 cmt. b; Bradley & Goldsmith, *supra*, at 831–32 & n.109. They did not involve disputes under BITs or multilateral investment treaties, which did not become common until the 1970s. *See* Azubuike, *The Place of Treaties in International Investment*, 19 Ann. Surv. of Int'l & Compar. L. 155, 161–62 (2013).

Again, Zhongshan's position would hide elephants in mouseholes. By the time of the New York Convention in 1958, there was already support for domestic courts to resolve disputes between private parties and foreign sovereigns under *private* law. But for disputes between private parties and foreign sovereigns under *public* law, applying the Convention would have not only eliminated bedrock immunity protections but also undercut espousal requirements, in broad fields where both would otherwise be required. Again, it is highly unlikely that treaty drafters would have effected such sweeping changes through an unadorned reference to "persons," in a Convention focused mainly on private commercial trade. And it is highly unlikely, if such sweeping changes were under consideration, that none of the negotiating countries, interested parties, or commenters would have even noted the issue.

3

My colleagues object to this analysis based on what they view as two separate acts of consent by Nigeria—signing a BIT requiring certain disputes to be arbitrated and signing the New York Convention calling for certain arbitral awards to be enforced. *Ante* at 22–24.

As for the Convention, Zhongshan's interpretation requires contracting parties to enforce awards against other sovereigns that have *not* signed the Convention. For covered commercial disputes between covered persons, all that matters is that the award was made outside the territory of the signatory country where enforcement is sought and inside the territory of another signatory country. N.Y. Convention art. 1(1), (3). Because the award here was made in the United Kingdom, which has acceded to the Convention, the fact that Nigeria also has acceded to the Convention makes no difference to the analysis whether the Convention covers Zhongshan's award.

My colleagues stress that Nigeria *has* signed the Convention, *ante* at 22–23, but its construction of the treaty would apply regardless. Moreover, even as to signatory countries, Zhongshan construes the Convention to override what would otherwise have been bedrock principles of immunity and espousal in 1958. My colleagues explain that sovereigns *may* waive these basic protections. *Ante* at 22–24; *see also id.* at 36 (any presumption "against treating states as persons fades when a state consents to a suit"). True enough, but they still have no persuasive account of why the Convention's mere reference to "persons" should be understood to have such a dramatic yet unnoticed consequence, despite the strong interpretive presumption against reading that general term to restrict the public acts of governments.

As for the BIT, my colleagues stress that Article 9 reflects Nigeria's consent to arbitrate directly with Chinese investors. *Ante* at 22–24. Again true enough, but an agreement to arbitrate is a far cry from consent to enforcement in the domestic courts of a co-equal sovereign. The same is true for a general commitment "to the enforcement of the award," Nigeria-China BIT art. 9(6), which most naturally means enforcement through diplomatic processes or international tribunals. *See* Third Restatement, *supra*, § 906 & cmt. b.

\*   \*   \*   \*

In sum, the relevant historical and legal background cuts strongly against Zhongshan's expansive interpretation of the Convention.

## C

Because treaties are agreements, courts may consider "negotiation and drafting history" to determine "the shared understanding" of the parties. *GE Energy Power Conversion*

*France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 441 (2020) (cleaned up). And while text is of course the best evidence of that understanding, courts should strive to avoid conflict with the "intent or expectations of its signatories." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 717–18 (D.C. Cir. 2022) (cleaned up). Here, drafting history confirms what text and context strongly suggest—that the Convention does not extend to disputes arising from sovereign acts governed by public law.

Consider the report of the committee charged with drafting the Convention. It included representatives from nine different countries, ranging from Belgium to the Soviet Union and including five of the original 24 signatories. *See Report of the Committee on the Enforcement of International Arbitral Awards*, at 2, U.N. Doc. E/AC.42/4 (Mar. 21, 1955) (*Drafting Committee Report*). The Drafting Committee decided to change the name of the Convention from one about enforcing "International" arbitral awards to one about enforcing "Foreign" awards, out of concern that "International" might suggest coverage of state-state arbitrations. *See id.* at 5. As the Committee explained, the Convention "does not deal with arbitration between States, but deals with recognition and enforcement in one country of arbitral awards made in another country." *Id.* My colleagues read this statement as possibly meaning that the Convention does not deal *exclusively* with arbitration between States, but *also* deals with the recognition and enforcement of foreign arbitral awards, *see ante* at 30–31, but that reading is surely strained. And if the Convention "does not deal with arbitration between States," then Zhongshan's position must be wrong: There is no colorable basis, in linguistic usage or background legal context, to make one party's personhood under the Convention turn on the identity of the other party. If "persons" extends to governments acting in their sovereign capacity in disputes with private parties, then

16

it also extends to governments acting in their sovereign capacity in disputes with other governments. My colleagues formally reserve the question whether their interpretation would sweep in state-state disputes under public international law. *See id.* at 31–32. Yet that is the clear implication of their position, and it is inconsistent with this drafting history.[2]

The report of the Drafting Committee supports Nigeria in another important respect. The Belgian representative on the Committee proposed that the Convention "should expressly provide that public enterprises and public utilities should be deemed to be legal persons … *if their activities were governed by private law*." *Drafting Committee Report*, *supra*, at 7 (emphasis added). But even the representative from Belgium, which had already adopted the restrictive theory of sovereign immunity, did not seek to extend the Convention to disputes governed by public law. Nor did the Drafting Committee itself. It rejected Belgium's proposal as "superfluous" but decided

---

[2] To distinguish state-state disputes, my colleagues characterize the investor-state dispute here as one governed "in material part by domestic law." *Ante* at 31–32. But the claims here arise under the BIT, an international agreement governed by public international law. *See* Third Restatement, *supra*, § 487 cmt. f. To be sure, the BIT itself recognizes that domestic law as well as international law will be relevant to any investor-state dispute. Art. 9(7). But questions of public international law frequently turn in part on domestic public law; for instance, the question whether a government's treatment of aliens violates international law often turns on how the government treats similarly situated citizens. *See*, *e.g.*, *id.* arts. 2(3), 3(2); *Phillip*, 592 U.S. at 176–77. So the fact that domestic law sets the backdrop for the international claims at issue here is hardly unusual. Nor would it distinguish a state-state arbitration under Article 8 of the BIT if China had chosen to espouse the claims that Zhongshan raised here under Article 9.

that a "reference in [its] report would suffice" to note its agreement with Belgium. *See id.*

Other parts of the drafting history reinforce these points. In supporting a different change to the Convention's title, Switzerland pressed its view that the Convention covers "international awards in private law," but *not* "international awards in public law." *See* U.N. Secretary-General, *Recognition and Enforcement of Foreign Arbitral Awards*, at annex I, 8–9, U.N. Doc. E/2822 (Jan. 31, 1956) (*Secretary-General Report*). A representative of Italy—another early adopter of the restrictive theory of immunity—expressed concern that the reference to "disputes between legal persons" could be misconstrued to encompass "a dispute between States." U.N. Conf. on Int'l Com. Arb., *Summary Record of the Sixteenth Meeting*, at 5, U.N. Doc. E/Conf.26/SR.16 (June 3, 1958) (cleaned up). But the President of the Conference at which the Convention was finalized responded that the Drafting Committee "had had no such intention when it had prepared the draft Convention." *Id.* Finally, a representative of the United States stressed the importance of the Convention to the efficient settlement of "private disputes arising out of international trade," suggesting no extension to disputes under public international law. U.N. Conf. on Int'l Com. Arb., *Summary Record of the Second Meeting*, at 8, U.N. Doc. E/CONF.26/SR.2 (May 21, 1958).

Against all of this, including a written report of the Drafting Committee itself, my colleagues highlight a two-sentence comment by Austria, which neither participated on the Committee nor was an original signatory of the Convention, and comments by one private party. *Ante* at 33–35. Neither of these comments produced any response from either the Drafting Committee or any of the contracting parties. In the Convention's overall drafting history, these comments do not

count for much. But even on their own terms, the comments help Nigeria more than Zhongshan.

Start with Austria. First, it asserted that the Convention covers awards for or against states made "in cases of disputes with subjects of private law." *Secretary-General Report*, at annex I, 11. The garbled reference to "disputes with subjects of private law" most likely meant private-law disputes, which would simply reiterate that the Convention covers awards against sovereigns arising from their private acts. And even if "disputes with subjects of private law" meant government disputes with private parties, as my colleagues suggest, that still would not clearly pick up investment disputes between governments and private parties arising from sovereign acts governed by public law—a legal category that would have been unrecognizable in 1958. Moreover, Austria's second sentence confirms that it meant no such thing: "Nevertheless, it would be desirable to provide expressly that the convention is also applicable in cases in which corporate bodies under public law, and particularly states, *in their capacity as entities having rights and duties under private law*, have entered into an arbitration convention for the purpose of the settlement of disputes." *Id.* (emphasis added). Taken as a whole, Austria's comments do not suggest that the Convention reaches sovereign acts regulated by public law. And in any event, we should not "dissect" one garbled phrase from Austria's comment as if it were treaty text. *See Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Comments by the Society of Comparative Legislation are also helpful to Nigeria. The Society proposed an amendment to provide that governments are covered persons "on the condition" that the dispute "arose out of a commercial contract or a private business operation." *Society-General Report*, at Annex II, 9. That is consistent with the Convention covering

sovereigns acting in a private but not governmental capacity. Moreover, the Society further proposed changing the title of the Convention to cover international disputes "in private law," to make even clearer that it does *not* cover "arbitration in public international law." *Id.* at 4.

Far from ambiguous or messy, the drafting history reveals a consensus that the word "persons" includes governments acting as private parties under private law but does not include governments acting as sovereigns under public law.

D

My colleagues offer five further arguments based on post-ratification evidence, but none moves the needle.

*First*, my colleagues characterize Nigeria's interpretation of the Convention as novel and unsupported. *Ante* at 21. But many commentators have supported it. *See*, *e.g.*, Third Restatement, *supra*, § 487 cmt. f ("Ordinarily, arbitration of a controversy of a public international law character, such as … a dispute about the interpretation of or performance under an international agreement … , is not subject to the New York Convention …."); *ICCA's Guide to the Interpretation of the 1958 New York Convention: A Handbook for Judges* 85 (Int'l Council for Comm. Arbitration 2011) ("The expression 'persons, whether physical or legal' in Article I(1) of the Convention is generally deemed to include public law entities entering into commercial contracts with private parties. Courts … frequently invoke the distinction between *acta de jure gestionis* [private acts] and *acta de jure imperii* [public acts] …."); M. Sornarajah, The Settlement of Foreign Investment Disputes 309–10 (2000) ("The New York Convention was not designed for enforcement of arbitral awards against state parties.… [T]he fact that [a] dispute was caused by a sovereign

act, usually an act of nationalization[,] makes enforcement under the Convention highly unlikely.").

In any event, it is no surprise that the question presented has not produced litigated decisions. For many investment disputes between host countries and foreign investors, the New York Convention applies because the host and the investor have a commercial relationship, and the dispute involves breaches of the governing contracts or other private-law disputes. *See*, *e.g.*, *Diag Human v. Czech Republic—Ministry of Health*, 824 F.3d 131, 132–34 (D.C. Cir. 2016); *TermRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 929–31 (D.C. Cir. 2007); *Creighton Ltd. v. Government of the State of Qatar*, 181 F.3d 118, 120 (D.C. Cir. 1999). Moreover, most investment disputes between host countries and foreign investors are resolved under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, *opened for signature* Mar. 18, 1965, 17 U.S.T. 1291 (entered into force Oct. 14, 1966) (ICSID Convention), a multilateral treaty that became effective eight years after the New York Convention. The ICSID Convention established procedures for arbitrating such disputes, *id.* art. 25, and it truncated enforcement issues by granting awards the status of domestic judgments, *id.* arts. 53–54. Over 160 nations have signed the ICSID Convention. Many foreign investors insist on both ICSID dispute-resolution processes and underlying treaty protection against sovereign acts such as discrimination, denial of protection or fair treatment, and uncompensated expropriation. So, because the ICSID Convention requires only that signatory states agree in writing to submit investment disputes to ICSID, *id.* art. 25(1), ICSID arbitrations typically cover claims by an aggrieved investor that a foreign state has breached treaty obligations through sovereign acts. *See*, *e.g.*, *The Loewen Group, Inc. v. United States*, ICSID No. ARB(AF)/98/3, Award at 9–10 (June 26, 2003) (claims under Chapter 11 of North American Free

Trade Agreement). In this case, arbitration through ICSID was unavailable because, although Article 9 of the Nigeria-China BIT envisioned ICSID involvement in making any "necessary appointments" to an "ad hoc arbitral tribunal," art. 9(4)–(5), Nigeria did not give the necessary consent to submit disputes under the BIT to ICSID. In short, the usual availability of ICSID arbitration for disputes like this one—not the novelty of Nigeria's reading on the New York Convention—explains why there is scant caselaw on whether the older, private-focused treaty applies to disputes arising from sovereign acts governed by public law.

*Second*, my colleagues invoke precedent that they say "corroborates" the conclusion that the New York Convention "fully appli[es] to arbitral awards arising from sovereign acts." *Ante* at 24–25; *see also id.* at 19 (Convention cases "involving foreign states charged with breaching investment and commercial treaty obligations"). None of these cases addresses either the scope of the FSIA's arbitration exception or the underlying question whether the Convention applies to awards arising from sovereign acts that violate treaties. And if "a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). Accordingly, the cited cases are not "persuasive, much less binding" on the overlooked issue whether the Convention applies to disputes arising from sovereign acts governed by public international law. *Schindler Elevator Corp. v. WMATA*, 16 F.4th 294, 299 (D.C. Cir. 2021); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings … have no precedential effect.").

For example, consider *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021) (*Tatneft II*), the case that my colleagues

discuss most fully.  True, it involved public acts that allegedly breached treaty obligations.  *See id.* at 832–33.  But our decision addressed only merits defenses under the Convention: whether the dispute fell outside the governing BIT, whether the district court impermissibly modified the award, whether enforcement would violate United States public policy, and whether the arbitral tribunal was improperly composed.  *See id.* at 835–40.  An earlier decision in the case, *Tatneft v. Ukraine*, 771 Fed. App'x 9 (D.C. Cir. 2019) (*Tatneft I*), did address jurisdiction and immunity issues under the FSIA.  But *Tatneft I* is an unpublished ruling that does not bind this panel.  *See In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011).  And in any event, *Tatneft I* did not address whether the New York Convention applies to disputes arising from sovereign acts, thus triggering application of the FSIA's arbitration exception.  Instead, *Tatneft I* held only that the FSIA's waiver exception applied because the allegedly breaching sovereign in that case had signed the New York Convention.  771 Fed. App'x at 10.  So, even if *Tatneft I* had been a published opinion, it still would not bind us here.[3]

*Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015), is similarly inapposite.  There, the arbitral award was based on

---

[3] The FSIA waiver ruling in *Tatneft I* is especially shaky.  In *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576 (D.C. Cir. 2020), we specifically noted that because *Tatneft I* "was an unpublished decision," its waiver holding "does not bind future panels."  *Id.* at 583–84.  Later in the same case, we expressly declined to apply *Tatneft I* after the Executive Branch expressed "significant policy concerns" with the view that merely signing the New York Convention, and agreeing to arbitrate in a signatory country, amounts to a waiver of sovereign immunity.  *Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771, 775 n.3 (D.C. Cir. 2022).

the failure of Ecuadorean courts to resolve pending contract claims. *Id.* at 202–03. But our decision did not address whether the New York Convention covers awards governed by public law; we explained that Ecuador had agreed to arbitrate the dispute and rejected its various merits defenses to enforcement. *See id.* at 203–09.

Or consider *BG Group PLC v. Republic of Argentina*, 572 U.S. 25 (2013), the Supreme Court decision cited by my colleagues. That case too involved public acts that allegedly breached treaty obligations. *Id.* at 29–31. But it addressed only the question whether an arbitrator had permissibly construed a "local litigation requirement" in the governing BIT. *Id.* at 30–32. The Court did not address whether the New York Convention applies to public acts that allegedly violate treaties. Nor could that question have even arisen: The arbitration in *BG Group* took place in the United States, which triggered a prong of the FSIA's arbitration exception different from the one at issue here. *See* 28 U.S.C. § 1605(a)(6) (arbitration exception applies to actions to confirm arbitral awards if "(A) the arbitration takes place … in the United States, [or] (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards").

One final point about our caselaw. Zhongshan heavily relies on *Belize Social Development, Ltd. v. Government of Belize*, 794 F.3d 99 (D.C. Cir. 2015), which construed the commercial reservation in the New York Convention to preserve coverage for "matters which have a connection to commerce." *Id.* at 105. We also declined to construe the reservation as limiting the Convention to disputes arising from acts that would qualify as commercial for immunity purposes. *See id.* at 104–05. Those rulings at least suggest that the defendant sovereign qualified as a "person[]" under the

Convention, though we did not directly address the issue. But the case involved only contract claims: Belize sold real property to a private company to develop a telecommunications facility and promised to give the company tax and regulatory relief. *See id.* at 100. The case thus straddles the boundary of public and private international law, with duties grounded in private contract law but involving public acts. Perhaps private law should govern sovereigns in these circumstances, subject to whatever limits public law may impose on their ability to contract away governmental prerogatives. *Cf. United States v. Winstar Corp.*, 518 U.S. 839 (1996) (breach-of-contract liability for sovereign acts). Regardless, this case is different: Nigeria engaged in *no* private conduct with and had *no* private-law obligations to Zhongshan, which brought a *treaty* claim based *solely* on Nigeria's *sovereign* acts, actual or imputed, for breaching its duties under *public* international law. That falls squarely on the public side of the line, today as well as in the late 1950s.

*Third*, the majority points to a footnote in an *amicus* brief that the government filed some 44 years ago. *Ante* at 25–26. The brief opined that the New York Convention does not prevent enforcement of an arbitral award based on contract claims arising from an expropriation. Brief for the United States as Amicus at 20 n.16, *Libyan Am. Oil Co. v. Socialist People's Libyan Arab Jamahiriya*, Nos. 80-1207, 80-1252 (D.C. Cir. June 16, 1980) (*LIAMCO*). *LIAMCO* is thus similar to *Belize*, with a private-law claim predicated on a public act. So it seems to me unclear what position the United States might take here, where the claim cannot be grounded in any contract governed by private law. In any event, the government filed its amicus brief 22 years after the Convention. And post-ratification conduct "decades after the finalization of the New York Convention's text in 1958" is at best weak "evidence of

the original shared understanding of the treaty's meaning." *See GE Energy*, 590 U.S. at 443.

*Fourth*, my colleagues point to the Energy Charter Treaty (ECT), *opened for signature* Dec. 17, 1994, 2080 U.N.T.S. 95, which they say "treated the New York Convention" as covering awards "arising from sovereign acts." *Ante* at 27–28. But the ECT did not amend the Convention. Instead, it decreed that certain claims governed by the ECT "shall be considered to arise out of a commercial relationship" for purposes of the Convention, art. 26(5)(b), thus prohibiting ECT signatories from applying the commercial reservation to covered claims. At most, this provision obligates ECT signatories to enforce ECT arbitral awards *as if* they arose under the New York Convention, which says nothing for non-ECT signatories such as the United States. Moreover, the ECT was not opened for signature until some 36 years after the Convention was adopted. So this post-ratification conduct is of little value "as evidence of the original shared understanding of the treaty's meaning." *See GE Energy*, 590 U.S. at 443.

*Finally*, my colleagues claim support from Congress's command that "[e]nforcement of arbitral agreements … shall not be refused on the basis of the Act of State doctrine." *Ante* at 36–37; *see* 9 U.S.C. § 15. But the Act of State doctrine affords a substantive rule of decision—United States courts may not "declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). It can apply in litigation between private parties no less than in litigation between private parties and the foreign sovereigns themselves. *See id.* at 405–06. So, barring its application does not signal a congressional desire to extend the New York Convention to disputes in which the foreign sovereign itself is charged with violating public international law. In any event,

Congress did not enact the provision until 1988. Again, the views of a non-signatory party three "decades after the finalization of the New York Convention's text in 1958," are of little interpretive significance. *See GE Energy*, 590 U.S. at 443.

## III

Text, legal context, and drafting history all indicate that the word "persons," as used in the New York Convention, does not include signatory nations acting as sovereigns. I respectfully dissent.